**Elizabeth BARRETT, Individually and as Administratrix of the Estate of Harold Blauer, Deceased, Plaintiff,**

**v.**

**UNITED STATES of America, James Cattell, Newton Bigelow, Estate of Amedeo S. Marrazzi, Van M. Sim, Herbert K. Greer, Frederick C. Lough, Estate of Harris J. North, William M. Creasy, and George S. Leonard Defendants.**

**No. 76 Civ. 381 (CBM)**

United States District Court, S.D. New York.

Oct. 8, 1986.

---

**23.** I need not and do not, therefore, reach the second prong of the *Jackson Dairy* test—the

balance of the equities.

Baer Marks & Upham, by Deborah Linfield, New York City, for plaintiff.

Rudolph W. Giuliani, U.S. Atty., D.N.Y. by Beth A. Kaswan, New York City, for defendants.

## OPINION

MOTLEY, Chief Judge.

This action arises from the death of Harold Blauer on January 8, 1953 as the result of injections of synthetic mescaline compounds he was given at the New York State Psychiatric Institute. Shortly after Mr. Blauer's death, his ex-wife brought an action against the State of New York on behalf of the estate, which she eventually settled.

In 1975 it was disclosed that the drug compounds injected into Mr. Blauer had been supplied by the United States Army as part of chemical warfare experiments. After this revelation, Mr. Blauer's daughter, Elizabeth Barrett, instituted three lawsuits during the period from 1976 through 1978 against the United States government and against various employees of the United States and the State of New York.

In essence, plaintiff requested damages for three alleged wrongs: conspiracy to use Mr. Blauer in chemical warfare experiments without his knowledge or consent,

negligent treatment with the drug compounds, and a post-death conspiracy to conceal the role of the federal government in the matter. From the time these actions were commenced, defendants have moved to dismiss them on numerous grounds, including failure to state a claim, lack of personal jurisdiction, res judicata, statute of limitations, immunity, release, and lack of standing. This extensive motion practice and the final consolidation of the three cases into one has at last given birth to the current action, which is about to go to trial.

By Opinion and Order dated March 18, 1980, the court granted the motion of certain individual defendants [1] to dismiss the actions against them based on lack of personal jurisdiction. Plaintiff then moved for leave to reargue the motion in the future, after she had had a chance to develop in discovery facts that would establish personal jurisdiction. In an order dated August 29, 1980, the court granted plaintiff's motion and vacated the prior order of dismissal.

Now that discovery is complete, several federal defendants, some of whom are among those who moved for dismissal in 1980, have again moved to dismiss the action with respect to them for lack of personal jurisdiction. These defendants are the Estate of Amedeo S. Marrazzi, Van M. Sim, Herbert K. Greer, Frederick C. Lough, the Estate of Harris J. North, William M. Creasy, and George S. Leonard (the "moving defendants").

## BACKGROUND

In December of 1952, Harold Blauer, 42 years old, was admitted voluntarily to the New York State Psychiatric Institute (NYSPI) for psychotheraputic treatment for depression. During the course of his treatment, Mr. Blauer was injected on several occasions with a synthetic mescaline derivative. On January 8, 1953, after one of these injections, he died. The death certificate furnished by the New York City

Medical Examiner listed the cause of death as "Coronary arteriosclerosis; sudden death after intravenous injection of a mescaline derivative, January 8, 1953."

The synthetic compound that killed Mr. Blauer was supplied by the United States Army Chemical Corps pursuant to a contract between the Corps and NYSPI. The contract provided for the testing on human subjects of experimental mind-altering compounds developed for chemical warfare. The contract prohibited NYSPI from disclosing the Army's involvement. Thus Blauer was not aware of the source of the drugs at the time of the injections, nor was Blauer's family aware of the Army's role until the Secretary of the Army disclosed this information in August of 1975.

Upon learning of Blauer's death, Dr. Amedeo S. Marrazzi went to NYSPI in New York on January 10, 1953 to investigate. Dr. Marrazzi was the Army's Project Officer for the NYSPI drug testing contract at the time of Mr. Blauer's death. His estate is one of the moving defendants.

At NYSPI, Marrazzi obtained records detailing the effects of the injections. According to Dr. Marrazzi's trip report, while in New York he also "prevailed on one of the New York City medical examiners ... to place all the records in a confidential file in the medical examiner's office." Marrazzi also attended a meeting at NYSPI on February 4, 1953, at which he discussed safety procedures for the drug testing program. Marrazzi discussed Blauer's death again on February 16, 1985 with General William Creasy, the Commander of the Chemical Corps. In April of 1953, Amy Blauer, Mr. Blauer's ex-wife and the administratrix of his estate, brought an action for damages against the State of New York in the New York Court of Claims. Mr. David Marcus, then Assistant Attorney General of the State of New York, was assigned to defend the case. In the course of the defense he uncovered the Army's role in Blauer's death. Marcus conferred

---

1. The defendants who moved to dismiss in 1980 were Creasy, Derrick, Fredericks, Greer, North, Bayliss, Loucks, Lough, and Dill. Of these Creasy, Greer, North, and Lough are among the defendants currently moving this court to dismiss.

with the Army's litigation division on January 13 and 14, 1954. He was told that information about the source of the chemical compound that had caused Blauer's death was classified and that the Army's role was to be kept secret.

On July 6 and 12, 1954, moving defendants Leonard, Marrazzi, Greer, and North met with other officials at the Department of Justice to consider the Government's response to Blauer's death. At the time, Leonard was first assistant to then Assistant Attorney Gerneral Warren E. Burger, Civil Division, U.S. Department of Justice; Marrazzi was project officer for the drug-testing contract with NYSPI; Greer was Legal Advisor to the Chief Chemical Officer; and North was an attorney with the Army Advocate General Corps. Among the issues these men discussed were ways to conceal the Army's involvement with the injections. David Marcus attended at least one of these meetings, and he did in fact work to conceal the Army's involvement throughout the litigation and settlement negotiations carried on in New York. Further discussions within the federal government about the need to keep the Army's role in Blauer's death secret involved at various times moving defendants Greer, Creasy, Leonard, Marrazzi, and North.

In October of 1954, North wrote a memorandum to Greer recommending that certain documents linking the Army with Blauer's death be removed from New York to the Chemical Corps Procurement Agency in Maryland, where he believed they would be beyond the subpoena power of a New York court. Those documents were in fact never produced or revealed to the Estate in the 1950's and were later discovered in the safe of moving defendant Dr. Van M. Sim, who took over Dr. Marrazzi's responsibilities in January of 1956 at the Edgewood Arsenal in Maryland. Mr. Sim was also stationed at the Edgewood Arsenal from November, 1952 to November, 1954, during which time he worked for the United States Navy and, he claims, was uninvolved with any chemical testing.

In March of 1955, moving defendant Frederick Lough succeeded Herbert Greer as Legal Advisor to the Chief Chemical Officer. Lough recommended that his office consider paying one half of a settlement arrangement between New York State and Blauer's estate to protect the secrecy interests of the United States Government.

Later in 1955, Blauer's estate agreed to settle its claim against the State of New York for $15,000. Under procedures in effect in 1955, the State of New York could not settle the case without presenting evidence of *prima facie* liability to the New York Court of Claims. Before making this showing in open court, Assistant Attorney General Marcus revealed the Army's involvement to the Claims Court judge in an *ex parte* conference. In response, the judge increased the settlement figure to $18,000.

Amy Blauer, as administratrix of the estate, accepted the settlement and signed a broad release. The release covered not only the State of New York, its employees, and other persons involved, but also the "governmental body or agency which furnished the drug used in the drug study which resulted in the death of Harold Blauer." On June 9, 1955, the Department of the Army paid $9,000 to the State of New York to cover one half of the settlement.

The Army's involvement in Harold Blauer's death and the fact that the mescaline derivatives were furnished as part of its chemical warfare testing program remained secret for 20 years and would have remained so were it not for the disclosure of the surrounding facts by the Secretary of the Army on August 12, 1975.

## DISCUSSION

### I. *Procedural Issues*

 Plaintiff opposes the present motion to dismiss for lack of personal jurisdiction on both procedural and substantive grounds. Procedurally, plaintiff contends that defendants' motion to dismiss is im-

proper at this time because the action has not yet come to trial. The court's 1980 order vacating a prior order of dismissal for lack of jurisdiction gave the defendants leave to challenge jurisdiction again "at trial." *Barrett v. Hoffman*, 76 Civ. 381 (LWP) Order (S.D.N.Y. Aug. 29, 1980). This language does not preclude the court from deciding the motion at this time.

■ A district court has "considerable procedural leeway" in deciding a motion to dismiss for lack of personal jurisdiction. *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). It may determine the motion on the basis of affidavits alone, it may permit discovery, or it may conduct an evidentiary hearing on the merits of the motion. *Id.*

■ Although the case is not yet "at trial," the court has decided to entertain defendants' motion before trial for two reasons. First, since the 1980 order was issued, the Second Circuit has decided two cases that strongly affect the jurisdictional question presented here: *Green v. McCall*, 710 F.2d 29 (2d Cir.1983); and *Grove Press, Inc. v. Angleton*, 649 F.2d 121 (2d Cir. 1981). Second, because the factual record in this case has developed tremendously since 1980, the court is in a far better position to evaluate the factual basis of plaintiff's claim of jurisdiction than it was five years ago.

On the other hand, the court has chosen not to conduct a full evidentiary hearing on the motion prior to trial. At such a hearing, plaintiff would be required to prove the existence of jurisdiction by a preponderance of the evidence. *Marine Midland*, 664 F.2d at 904. Since the question of jurisdiction and the merits of this action are so intertwined, plaintiff should not be required to establish jurisdiction by this high standard before trial. *See United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir.1966); 12 Moore's Federal Practice, 12.07[2.–2].

■ In the absence of a full-blown evidentiary hearing, plaintiff must make only a *prima facie* showing of jurisdiction. *Ma-rine Midland*, 664 F.2d at 904. *Visual Sciences, Inc. v. Integrated Communications Inc.*, 660 F.2d 56 (2d Cir.1981). However, mere conclusory statements cannot be relied upon to establish this *prima facie* case. *See Newmark v. Abeel*, 102 F.Supp. 993, 994 (S.D.N.Y.1952), (Weinfeld, J.). Affidavits based on personal knowledge are to be credited over contradictory allegations based merely on information and belief, and facts adduced in opposition to jurisdictional allegations are considered more reliable than mere contentions offered in support of jurisdiction. *Leasco Data Processing v. Maxwell*, 319 F.Supp. 1256, 1260 (S.D.N.Y.1970). After the case has gone to trial, plaintiff must then establish that jurisdiction exists by a preponderance of the evidence. *Marine Midland*, 664 F.2d at 904.

## II. *Personal Jurisdiction*

It is undisputed that none of the moving defendants is a resident of the State of New York and none was served with process within the State. However, the incorporative provisions of the Federal Rules of Civil Procedure 4(e), 4(f), and 4(i) allow a federal court to assert jurisdiction over a non-resident defendant under the long-arm statute of the state in which it sits if the assertion of jurisdiction is consistent with constitutional due process. *United States v. Montreal Trust Co.*, 358 F.2d 239, 240 (2d Cir.1966).

Plaintiff relies on the New York State long-arm statute, N.Y.Civ.Prac.Law Sec. 302(a)(2), to obtain jurisdiction over defendants. Sec. 302(a)(2) provides in relevant part that

a court may exercise personal jurisdiction over any nondomiciliary ... who in person or through an agent ...
2. commits a tortious act within the State....

N.Y.Civ.Prac.Law Sec. 302(a)(2) (McKinney 1972, Supp.1986).

### A. *The Agency Theory*

Plaintiff contends that the moving defendants are all subject to personal juris-

diction in New York because of acts committed within the state by their agents. More specifically, she asserts that a conspiracy to conceal the Army's involvement in the drug testing program existed among the moving defendants and other alleged co-conspirators in New York State, including David Marcus, such that the conspiratorial acts of Marcus and others within New York State may be imputed to the defendants for the purpose of gaining long-arm jurisdiction.

A co-conspirator may be an "agent" as that term is used in the New York long-arm statute. *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981); *Ghazoul v. International Management Services,* 398 F.Supp. 307, 312 (S.D.N.Y.1975). However, conspiracy, *per se,* is not a tort under New York law. *Grove Press,* 649 F.2d at 123; *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1074 (2d Cir.1977), *cert denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). The allegation of a conspiracy "is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts [performed by any of the co-conspirators]." *Grove Press,* 649 F.2d at 123 (quoting *Rutkin v. Reinfeld,* 229 F.2d 248, 252 (2d Cir.), *cert. denied,* 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956)).

Plaintiff asserts jurisdiction over the moving defendants as individuals. It is therefore necessary to determine whether an agency relationship, legally cognizable for jurisdictional purposes, existed between the defendants in their capacity as *individuals* and their alleged agents in New York. *See Green v. McCall,* 710 F.2d 29, 34 (2d Cir.1983); *Grove Press, Inc. v. Angleton,* 649 F.2d at 122. *Marsh v. Kitchen,* 480 F.2d 1270, 1273 (2d Cir.1973).

*Grove Press Inc. v. Angleton* is similar to the case presented here in that plaintiffs asserted long-arm jurisdiction on the basis of acts that defendants' alleged co-conspir-

ators committed in New York, and all of the alleged conspirators were government employees. 649 F.2d at 122. The *Grove Press* plaintiffs claimed that employees of the Central Intelligence Agency had conspired to violate their constitutional and statutory rights by the methods used to investigate the Grove Press Publishing Company. The district court asserted long-arm jurisdiction over CIA employees who had committed no acts in New York on the basis of acts committed in New York by other CIA employees. *Id.; see also Grove Press, Inc. v. CIA,* 608 F.2d 926, 927 (2d Cir.1979).

In reversing the district court's finding of personal jurisdiction, the Second Circuit stated that for purposes of applying N.Y. Civ.Prac.Law Sec. 302(a)(2), an agency relationship exists only when the alleged agent "acted in New York for the benefit of, with the knowledge and consent of, and under some control by the nonresident principle." *Grove Press,* 649 F.2d at 122. Noting that the district court had "found nothing to suggest that [the nonresident CIA employees] expected to benefit as individuals from the wrongdoing alleged ...", the Second Circuit held that the district court had erred in asserting jurisdiction over the agents as individuals. *Id.* at 122–23. It concluded that

> So far as the record discloses, [the alleged agents in New York] were simply United States employees acting as agents for the United States government.

*Id.* at 123.

The Second Circuit further refined the principles of *Grove Press* in *Green v. McCall,* 710 F.2d 29 (2d Cir.1983), in which the court held that no jurisdiction existed over Commissioners of the United States Parole Commission as individuals based solely on acts that certain hearing examiners, the Commissioners' alleged agents, had committed within the forum state.[2] The court focused on the requirement

2. Although the court in *Green* was ultimately faced with interpreting the Connecticut long-arm statute, it did so on the basis of its prior interpretation of New York's Sec. 302(a)(2), which had been the model for the Connecticut statute. *See Green,* 710 F.2d at 32–33.

enunciated in *Grove Press* that the act performed by the in-state agent benefit the principle personally.

> Under New York law it is established that [Sec. 302(a)(2) ] does not provide jurisdiction over a defendant in his individual capacity based on an agent's tortious act within the state unless the agent was representing the defendant in his individual capacity. [Citing *Grove Press* ].

*Green v. McCall,* 710 F.2d at 33. *Accord Marsh v. Kitchen,* 480 F.2d 1270, 1273 (2d Cir.1973) (dismissing action against Missouri Secret Service agent and an Assistant United States Attorney because they "did not stand to benefit" from the actions of their alleged agents, who were government employees in New York).

The *Green* court also noted that simply because an act was unconstitutional, and therefore not in the best interest of the government, does not necessarily lead to the conclusion that the act was taken for the personal benefit of a government employee. *Green,* 710 F.2d at 34.

Plaintiff in the case before us argues that there is no requirement under Sec. 302(a)(2) that the actions of defendants' alleged agents be for the individual benefit of the defendants. This contention is clearly incorrect, as the above discussion shows. Without a showing of personal benefit to the moving defendants, plaintiff's account of their alleged "conspiracy" to cover up the Army's involvement in Mr. Blauer's death, while disturbing, is to no avail in showing that this court may exercise jurisdiction over them as individuals.

Plaintiff does assert, however, that the conspiracy to cover up the Army's involvement was undertaken by the moving defendants "[i]n order to avoid liability and publicity." If defendants acted to avoid *personal* liability and publicity, then they thereby became subject to personal jurisdiction in New York because such actions would have been taken for their personal benefit. Jurisdiction may be asserted even if defendants acted from mixed motives, that is, if they acted in what they perceived to be the government's best interest but at the same time were acting for their personal benefit as well.

■ As for moving defendants Greer, Lough, North, and Leonard, who were all federal government lawyers, it is undisputed that their involvement with Harold Blauer's case began only after his death. Thus they could not have feared personal liability or adverse publicity if the Army's role in Mr. Blauer's death had come to light. Any concern they could have had regarding liability, adverse publicity, or any other potential harm could only have been with regard to their employer, the federal government. Plaintiff has conceded this point in oral argument. Thus, even if these federal attorneys did "conspire" with persons who took actions in New York to cover up the Army's involvement, under New York law these actions cannot be imputed to them as individuals for jurisdictional purposes.

The relation of Marrazzi and Creasy to Harold Blauer's death is quite different. They were both working for the Army's Chemical Corps in Maryland at the time of the death. Marrazzi was the project officer in charge of the contract under which the chemical compound that killed Blauer was supplied to NYSPI. Creasy was the Commander of the Chemical Corps, and thus ultimately responsible for the program that furnished the compound.

■ There is clearly a factual issue as to whether the association of these two individuals with Blauer's death, and the accompanying potential concern about personal liability and adverse publicity, motivated their actions in the alleged conspiracy to cover up the Army's (and their personal) role in the death. It is also possible, particularly regarding Marrazzi, that a cover-up could have been promoted to protect the defendants' professional reputations.

With respect to personal liability, the Second Circuit has determined that under New York law as it existed in 1953 members of the Army's Chemical Corps could have been subject to personal liability. In an opinion affirming one of this court's

earlier decisions in this case, the Second Circuit concluded that

> There can be no doubt that the Army Chemical Corps' alleged instigation of and participation in the experimental administration of the mescaline derivative to Blauer without his consent ... would have provided the basis for a valid claim [against individual Army personnel] ... Blauer's right to be free from a battery at the instigation of Army Chemical Corps officials could hardly be questioned at that time. Sovereign immunity could not at that time be availed of by them for their participation in such wrongful conduct.

*Barrett v. United States*, 798 F.2d 565, 574 (2d Cir.1986).

Thus it cannot be said from the undisputed facts now before this court that Marrazzi and Creasy did not benefit personally from the cover-up carried out by their alleged agents in New York. An agency relationship may have existed between them and actors in New York, such that the actions taken in New York could be imputed to them personally for the purpose of exercising jurisdiction under Sec. 302(a)(2), consistent with *Grove Press* and *Green.*

In addition to any acts Marrazzi might have committed through agents in New York, he evidently committed at least one act to cover up the Army's involvement while he was personally within the state of New York. On January 10, 1953, which was two days after Blauer's death, and then on February 4, Marrazzi made trips to NYSPI in the State of New York to investigate the death. According to Marrazzi's own trip report, during his first visit to NYSPI he

> prevailed on one of the New York City medical examiners with whom he was well acquainted to place all the records [regarding Blauer's death] in a confidential file in the medical examiner's office. Dr. Gettler, the Chief Toxicologist for the City of New York, requested some of the original material to· be used for the analysis, but readily acceeded to a re-

quest by the undersigned that all the data be treated as confidential.

Affidavit of Deborah Linfield, August 7, 1986, Exhibit A at 2. This act in furtherance of the cover-up, commited within New York State, also provides *prima facie* evidence that Marrazzi is subject to personal jurisdiction in New York.

Finally, as for moving defendant Van Sim, plaintiff does not contend that he had any direct involvement with Blauer prior to taking over Dr. Marrazzi's position in January of 1956. However, Sim was stationed at the Edgewood Arsenal in Maryland from November, 1952 to November, 1954. Thus he was present at Edgewood at the time of Blauer's death in 1953. According to Sim's deposition testimony, he was stationed at Edgewood's Naval Unit as a liason officer working for the Department of the Navy. He also stated in his deposition that he was involved in no chemical testing of any kind during this time.

Plaintiff has produced record cards that she claims show that Sim was Project Officer for two chemical testing contracts during his first assignment at Edgewood. Plaintiff alleges that these contracts, numbered 4915 and 5198, were related successor contracts to the contract under which the Chemical Corps supplied the compound that killed Harold Blauer.

Although the name of the Project Officer for contract 4915 is not easy to read, there is no doubt that the person listed is not Sim, but Dr. Marrazzi. Sim is, however, listed on the card for contract 5198. This contract began on December 15, 1953 and was closed on June 30, 1958. It is impossible to know for sure from the cards whether Sim was appointed Project Officer before he left Edgewood in 1954 or only after he returned to Edgewood to take Dr. Marrazzi's position in 1956. (He was stationed in Great Britain in the interim.)

■ However, even if Sim had been ·Project Officer for contract 5198 from its inception, this fact alone is insufficient to show that Sim might have benefited personally from the cover-up of the Chemical

Corps' role in Blauer's death. Blauer died on January 8, 1953, and the contract for which Sim was Project Officer did not begin until December 15, 1953. Thus, plaintiff has produced no evidence connecting Sim with any activities leading to Blauer's death, aside from his mere presence in Edgewood at the time. Therefore, any possibility that Sim could have promoted the cover-up to avoid *personal* liability or adverse publicity is too remote to support even a *prima facie* showing of personal jurisdiction under the standard of *Grove Press* and *Green.*

Plaintiff also points out that Sim's trip reports show that he travelled to NYSPI in New York in connection with contract 5198 in September of 1956. The agency analysis of *Grove Press* and *Green* is inapplicable to acts committed in New York in person. However, for jurisdiction to be established under Sec. 302(a)(2), a *tortious act* must have been performed in New York either in person or through an agent. Plaintiff has not alleged that Sim performed a tortious act (that is, an act in furtherance of the alleged cover-up) while at NYSPI. On the contrary, the detailed trip reports show only that Sim and his colleages engaged in a routine inspection of NYSPI's conduct of contract 5918 while in New York. There is no mention made of Blauer's death or anything related to a cover-up.

Thus, plaintiff has failed to establish a *prima facie* case of personal jurisdiction over Greer, Lough, North, Leonard, or Sim.

### B. *The Fiduciary Shield Doctrine*

In addition to defendants' arguments based on *Grove Press* and *Green* regarding jurisdiction derived from agency, defendants contend that none of them is subject to the personal jurisdiction of New York courts because of New York's fiduciary shield doctrine. The doctrine insulates corporate employees from suit in New York when their only contacts with the state were in their corporate, as opposed to their personal, capacity. *See, e.g., Marine Midland Bank v. Miller,* 664 F.2d 899, 902 (2d Cir.1981); *Nordic Bank, PLC. v. Trend*

*Group, LTD.,* 619 F.Supp. 542, 569 (S.D.N.Y.1985); *Laufer v. Ostrow,* 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982). The doctrine applies equally to acts committed in person within the state and to acts committed through an agent within the state. *See Laufer v. Ostrow,* 55 N.Y.2d at 314, 449 N.Y.S.2d at 460, 434 N.E.2d at 696; *Nordic Bank, PLC. v. Trend Group, LTD.,* 619 F.Supp. at 570. Although the doctrine has been criticized, *see Columbia Briargate Co. v. First National Bank,* 713 F.2d 1052, 1059–60 (4th Cir.1983), New York courts continue to follow and even to extend the doctrine, *see, e.g., Sheldon v. Kimberly-Clark Corp.,* 482 N.Y.S.2d 867, 869, 105 A.D.2d 273 (1984) (extending the doctrine to a case in which a corporate official committed a tort outside New York that caused injury in New York).

The rationale for the fiduciary shield doctrine is that it would be unfair to force an individual to defend a suit brought against him personally in a forum state where he does not reside and where his only relevant contacts are acts he performed for his employer rather than for his own personal benefit. *Marine Midland Bank v. Miller,* 664 F.2d at 902. This rationale leads to the following test for the doctrine's application:

> [W]hen a corporate employee acts in *his own personal interest* rather than in the best interest of his corporation, he is not protected by the fiduciary shield since it is equitable that his self-interested actions be considered his own and be treated as a predicate for the exercise of jurisdiction over him personally.

*Id.* at 903 (emphasis added); *Accord Sheldon v. Kimberly-Clark Corp.,* 482 N.Y.S.2d at 869.

Thus both the fiduciary shield doctrine and the agency analysis of *Grove Press* and *Green* require that the person over whom jurisdiction is asserted have benefited personally from the act on which jurisdiction is based.

 Without deciding whether the fiduciary shield doctrine should be extended beyond corporate employees to government employees, the court finds that in this case

its application would lead to the same result as the agency analysis of *Grove Press* and *Green* discussed above. Since plaintiff has made out a *prima facie* case that Marrazzi and Creasy stood to benefit personally from the cover-up of the Chemical Corps' involvement in Blauer's death, these defendants would not be shielded by the doctrine. Likewise, since plaintiff has failed to make out a *prima facie* case of personal benefit with respect to the other moving defendants, the doctrine would shield them from jurisdiction.

## CONCLUSION

Defendants' motion to dismiss is granted with respect to Greer, Lough, North, Leonard, and Sim, because plaintiff has failed to make out a *prima facie* case that this court has jurisdiction over them. Defendants' motion to dismiss is denied without prejudice with respect to Marrazzi and Creasy. These defendants are free to raise the issue of jurisdiction again at trial. At that time, plaintiff will bear the burden of establishing this court's jurisdiction over them by a preponderance of the evidence.