**FIRST CAPITAL ASSET MANAGEMENT, INC.,**
et ano., Plaintiffs,

v.

**BRICKELLBUSH, INC.,**
et al., Defendants.

**No. 00 CIV. 5597(LAK).**

United States District Court,
S.D. New York.

July 29, 2002.

Eric W. Berry, Eric W. Berry Law Office PC, New York City, for Plaintiffs.

Russell P. McRory, McRory and McRory, P.L.L.C., Garden City, NY, for Defendants Satinwood, Inc., Sphinx Rock, N.V., Ahmed Vahabzadeh, Afsar Vahabzadeh, Savco, S.A., and The Estate of Soleyman Vahabzadeh.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs are judgment creditors of certain of the defendants and allege that they have been hindered by violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") [1] and various state law torts in their efforts to collect their judgments. Their initial complaint was dismissed substantially on the ground that it failed sufficiently to allege a pattern of racketeering activity.[2] The moving defendants Ahmed Vahabzadeh ("Ahmed"), Afsar Vahabzadeh ("Afsar"), the Estate of Soleyman Vahabzadeh ("Soleyman's Estate"), Satinwood, Inc. ("Satinwood"), Sphinx Rock, N.V. ("Sphinx Rock"), and Savco, S.A. ("Savco") [3] now seek an order dismissing (1) the amended complaint against the moving defendants for failure to state a claim pursuant to Rule 12(b)(6)

or, in the alternative, pursuant to Rule 12(b)(1) for lack of standing and subject matter jurisdiction, and (2) all claims against Afsar, Ahmed, and Afiwa, S.A. ("Afiwa") pursuant to Rule 12(b)(2) for lack of personal jurisdiction.

The amended complaint asserts eight claims for relief. Counts One through Four are New York law fraudulent conveyance claims against Sohrab, Ahmed, Afsar, Soleyman's Estate, Sphinx Rock, Satinwood, Peninsula, and "John Does 1–20." Count Five is substantive RICO claim under 18 U.S.C. § 1962(c) against Sohrab and Afsar. Count Six is a RICO conspiracy claim under 18 U.S.C. § 1962(d) against Sohrab, Ahmed, and Afsar. Count Seven is a reverse corporate veil piercing and *alter ego* liability claim against Afiwa. Count Eight is a successor liability, common corporate enterprise, and *alter ego* liability claim against Savco.

### I. Standing

As the moving defendants' standing arguments implicate the Court's subject matter jurisdiction,[4] the Court will address these arguments first.

### A. Applicable Standard

▆▆▆▆ It is unclear whether dismissal for lack of standing properly is sought under Rule 12(b)(6) or Rule 12(b)(1).[5] The

---

**1.** 18 U.S.C. § 1961 *et seq.*

**2.** *First Capital Asset Mgmt., Inc. v. Brickelbush,* 150 F.Supp.2d 624 (S.D.N.Y.2001) (*"FCAM I"*).

**3.** For the sake of convenience, the moving defendants often will be referred to as simply "defendants" throughout this opinion.

Sohrab Vahabzadeh has not joined in this motion. The amended complaint does not assert claims against Yousset Vahabzadeh and Brickellbush, Inc. The Court dismissed the action with respect to Jens Schlegelmilch and Iradj Vahabzadch for lack of prosecution by its order of July 12, 2002.

Although the Court initially dismissed the action as to Afiwa for lack of prosecution, it vacated that order with respect to Afiwa by its order dated April 15, 2002.

**4.** *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n. 3 (2d Cir.1999).

**5.** *Compare Moore,* 189 F.3d at 169 n. 3 ("Because loss causation is an element of standing to sue under the RICO statute, the appropriate ground for dismissal for failure to plead loss causation would seem to be the lack of subject matter jurisdiction rather than the

question is academic, however, because even when a standing motion is considered under Rule 12(b)(6), the district court is authorized to consider matters outside the pleadings and to make findings of fact when necessary.[6] Because the more recent Second Circuit authority suggests that dismissals for lack of standing more properly are sought under Rule 12(b)(1),[7] the applicable standards under Rule 12(b)(1) and 12(b)(6) are not materially different in the standing context,[8] and the moving defendants' ask for dismissal pursuant to Rule 12(b)(1), the Court will consider the standing arguments under Rule 12(b)(1).

In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings, such as affidavits and other documents.[9] While the plaintiff has the ultimate burden of establishing subject matter jurisdiction and generally must establish jurisdiction by a preponderance of the evidence when the defendant makes a "factual challenge" on a Rule 12(b)(1) motion,[10] "where '[subject matter] jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment.' " [11] Here, the proximate cause and

plaintiffs' failure to state a claim."), *with Thompson v. County of Franklin,* 15 F.3d 245, 247 (2d Cir.1994) (noting that, while motions to· dismiss for lack of standing "may be made" pursuant to Rule 12(b)(6), standing is a jurisdictional doctrine), *and Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 594 (2d Cir.1993) ("[W]e realize that dismissals for lack of standing may be made pursuant to Rule 12(b)(6) rather than 12(b)(1) .... ").

6. *See Thompson,* 15 F.3d at 249 (district court may base its finding that a party lacks standing on "either the complaint alone or the complaint supplemented by undisputed facts gleaned from the record" or by "resolv[ing] disputed issues of fact"); *Rent Stabilization,* 5 F.3d at 594 (same). *See generally* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1350, at 211–22 (1990) ("WRIGHT & MILLER 2D") (noting that there are two types of 12(b)(1) motions, facial and factual attacks, and that consideration of the pleadings will suffice in a facial attack, but that affidavits and other evidence should be considered when the attack is factual in nature).

7. *See Moore,* 189 F.3d at 169 n. 3.

8. *See supra* note 6.

9. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000); *Fier v. United States,* No. 01 Civ. 2225(JGK), 2002 WL 453177, at *1 (S.D.N.Y. Mar. 25, 2002).

10. *See Makarova,* 201 F.3d at 114 (on a Rule 12(b)(1) where district court refers to matters outside the pleadings, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists"); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 108 (2d Cir.1997); *Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991) ("On a motion ... challenging jurisdiction the court may *resolve disputed fact issues* by reference to evidence outside the pleadings." (emphasis added)) (cited with approval by *Transatlantic Marine Claims Agency, Inc.,* 109 F.3d at 108), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); 2 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 12.30[4], at 12–38 to 12–40 (3d ed. 2000) ("MOORE'S FEDERAL PRACTICE"). Here, defendants attack not only the sufficiency of plaintiffs' allegations, but the factual basis for them as well. *See, e.g.,* McRory Decl. Ex. G, Berry Dep. 113–14 (testimony that plaintiffs paid lawyers a flat fee for adversary proceeding).

11. *Dar El–Bina Eng'g & Contracting Co. v. Republic of Iraq,* 79 F.Supp.2d 374, 385 (S.D.N.Y.2000) (quoting *London v. Polishook,* 189 F.3d 196, 198 (2d Cir.1999), in turn quoting *Careau Group v. United Farm Workers of Am., AFL–CIO,* 940 F.2d 1291, 1293 (9th Cir. 1991)); *see also Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) ("While a 12(b)(1) motion cannot be converted into a Rule 56 motion, Rule 56 is relevant to the jurisdictional challenge in that the body of

injury questions central to the standing determination would be bound up also in any jury award of damages.[12] Thus, standing and the merits are intertwined, and the Court will employ the summary judgment standard on this Rule 12(b)(1) motion.

### B. RICO Standing .

#### 1. General Principles

 To invoke RICO's civil remedies, a plaintiff must have been "injured in his business or property *by reason of* a violation of section 1962." [13] This language "has been construed to require that in order to merit standing, a civil RICO plaintiff must establish that the RICO violation at issue was a proximate cause of the injury to the plaintiff's business or property for which redress is sought." [14]

"Because a plaintiff must show injury 'by the conduct constituting the violation' of RICO, the injury must be caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts." [15]

Plaintiffs make only bare bones allegations of injury to their business and property. They assert, on both the substantive and conspiracy claims, the following:

"Plaintiffs have suffered injuries proximately caused by the bankruptcy crimes and mail frauds set forth above, including, but not limited, to the following:

(a) The loss of any ability to satisfy their claims and judgments out of assets Sohrab was entitled to inherit from Soleyman and receive from Soleyman's Estate.

---

decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings.").

**12.** *See, e.g., De Falco v. Bernas,* 244 F.3d 286, 328–29 (2d Cir.) (affirming district court's vacatur of $1.6 million jury award in RICO case on grounds that there was insufficient credible evidence of any kind of damages proximately flowing from predicate acts that jury found), *cert. denied sub nom. Dirie v. DeFalco,* —— U.S. ——, 122 S.Ct. 207, 151 L.Ed.2d 147 (2001).

**13.** 18 U.S.C. § 1964(c) (emphasis added).

**14.** *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1344 (2d Cir.1994); *see Holmes v. Sec. Investor Protection Corp.,* 503 U.S. 258, 265–70, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 234 (2d Cir.1999), *cert. denied,* 528 U.S. 1080, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000); *Manson v. Stacescu,* 11 F.3d 1127, 1130 (2d Cir.1993), *cert. denied,* 513 U.S. 915, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994).

The *Holmes* Court made clear that factual, or "but for," causation is required as well. *See Holmes,* 503 U.S. at 266–67, 112 S.Ct. 1311; *DeFalco,* 244 F.3d at 329. Of

course, "but for" causation generally exists when proximate causation is present.

**15.** *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) (citation omitted) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Because " 'racketeering activity' consists of no more and no less than commission of a predicate act," *Sedima,* 473 U.S. at 495, 105 S.Ct. 3292, courts generally ask whether the plaintiff's injury was a proximate consequence of discrete predicate acts rather than some amorphous overarching pattern. *See id.* at 497, 105 S.Ct. 3292; Hon. Jed S. Rakoff & Howard W. Goldstein, Rico· Civil And Criminal Law And Strategy § 4.01[1], at 4–2 ("In the wake of *Sedima,* it is clear that civil RICO provides for recovery of damages to a plaintiff's business or property caused by RICO *predicate offenses.*" (emphasis added (footnote omitted))); *see also DeFalco,* 244 F.3d at 329 (declining to decide whether "a plaintiff may recover for injuries caused by the operation of a RICO enterprise, in addition to injuries caused by discrete unlawful predicate acts"). *Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000), lends support to the notion that it is injury flowing from predicate acts that counts for purposes of standing. *See id.* at 505, 507, 120 S.Ct. 1608 (holding, in RICO conspiracy context, that injury caused by an overt act in

"(b) The attorneys fees and expenses incurred in prosecuting their objections to Sohrab's fraudulent Chapter 7 petition in the *First Capital v. Vahabzadeh* adversary proceeding.

-and-

(c) The loss of any ability to execute directly against the assets Sohrab had gratuitously transferred to Afsar and Sohrab's siblings."[16]

Plaintiffs' allegations of injury thus can be divided into two categories for purposes of the standing analysis: the inability to collect their judgments (the "Lost Debt" injury) (sections (a) and (c) above), and the cost of pursuing their objections to Sohrab's bankruptcy discharge (the "Legal Fees" injury) (section (b) above).

### 2. Lost Debt Injury

Whether plaintiffs have standing based on their alleged Lost Debt injury is controlled by *Stochastic Decisions, Inc. v. DiDomenico*.[17] The plaintiff in that case was a judgment creditor of various defendants and their companies. As in this case, one of the defendant companies filed a bankruptcy petition that was dismissed when the company failed to file financial reports.[18] The plaintiff brought a civil RICO action charging the defendants with conspiracy to commit bankruptcy, wire, and mail fraud for the purpose of preventing the plaintiff from collecting the outstanding judgments.[19] The complaint alleged that the property transfers effected in the course of the conspiracy were fraudulent conveyances under state law and that the overall scheme constituted common law fraud.[20] Thus, while not identical, the facts of *Stochastic* and the facts of this case are substantially similar.

After a bench trial, the *Stochastic* court awarded judgment to the plaintiff against most of the defendants.[21] It awarded the plaintiff $467,477.24 on the civil RICO claim, which consisted of $50,000 in legal fees expended by plaintiff in attempting to collect its state court judgments[22] and $317,477.24 in RICO attorneys fees and expenses incurred in pursuing the RICO action.[23] The district court determined that the plaintiff was not entitled to the amounts owed on the state court judgments or the attorneys fees spent litigating those actions.[24]

The plaintiff appealed, arguing that it was entitled to recover the amounts of its state court judgments. The Second Cir-

---

furtherance of conspiracy that is not a predicate act will not support RICO standing).

16. Am. Cpt. ¶¶ 163(a)-(c), 178(a)-(c). The wording of paragraph 178 is slightly different than that of paragraph 163, but the Court can detect no meaningful difference in the substance of the allegations found in each paragraph.

17. 995 F.2d 1158 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993).

18. *Id.* at 1161–62.

19. *Id.* at 1163.

20. *Id.*

21. *Id.*

22. Because the court found the $50,000 to be "RICO damages," this amount was trebled, thus accounting for $150,000 of the total $467,477.24 award. *See id.* at 1164; *see also* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains ....").

23. *See Stochastic*, 995 F.2d at 1164. This amount was not trebled because it was not "RICO damages," but rather an award of statutory attorneys fees. *See id.* at 1164, 1167; *see also* 18 U.S.C. § 1964(c) (providing for recovery by RICO plaintiff of "the cost of the [RICO] suit, including a reasonable attorney's fee").

24. *See Stochastic*, 995 F.2d at 1165.

cuit, however, flatly rejected this argument.[25]

The *Stochastic* panel reaffirmed the principle laid down in *Bankers Trust Co. v. Rhoades*,[26] that "a debt is 'lost[,]' and thereby becomes a basis for RICO trebling[,] only if the debt (1) cannot be collected (2) 'by reason' of a RICO violation."[27] It reasoned that "a RICO claim does not accrue until it is established that collection of the claim or judgment has been successfully frustrated."[28] The court held that, to the extent the plaintiff successfully collected on the state court judgments by reason of their state law fraudulent conveyance claims, those amounts would reduce the RICO injury *pro tanto,* before any trebling occurred. Because the plaintiff's collection efforts were ongoing (by reason of the federal court action itself), and the actual amount of its injury was indefinite and unprovable, plaintiff did not yet have standing under RICO.[29]

Here, plaintiffs do not allege that collection of the amounts owed on the state court judgments has been "successfully frustrated," much less how any such ultimate frustration was a proximate consequence of any of defendants' predicate acts. Indeed, an affidavit submitted by plaintiff's counsel, Eric Berry, suggests that plaintiffs have commenced and prosecuted to judgment or settlement five lawsuits against transferees of Sohrab's allegedly fraudulently conveyed assets.[30] Their efforts, as evidenced by the state law claims in this case, are continuing and have met with varying degrees of success, grossing $370,000 as of the date of Mr. Berry's affidavit.[31] In short, plaintiffs neither have alleged nor offered any proof that the collection of the debt has been frustrated as a proximate consequence of any of the defendants' alleged predicate acts.[32] Accordingly, plaintiffs lack RICO standing based on their alleged Lost Debt injury.

**25.** *Id.*

**26.** 859 F.2d 1096 (2d Cir.1988), *cert. denied sub nom. Soifer v. Bankers Trust Co.,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158. In *Bankers Trust,* the plaintiff, a creditor of the defendants, claimed that it had lost debt injury because (1) in 1976 it relied on defendants' misrepresentations and accepted a bankruptcy reorganization plan that would have allowed it to recover only 17.5 percent of its allowed claim; (2) it lost the use of those funds from that time until the time of the lawsuit; and (3) funds which might have been used to pay the debt in 1981–82 were transferred fraudulently by the defendants. *See id.* at 1105–06. The court held that these damages were "unrecoverable" because the fraudulently induced reorganization plan had been vacated and bankruptcy proceedings were pending. *Id.* at 1106. As it was impossible to determine how much of this lost debt plaintiff might recover in the bankruptcy proceeding, the court considered the lost debt damages "speculative" and "unprovable" at the time of the lawsuit. *Id.*

The *Stochastic* court noted that *Bankers Trust* was the most persuasive authority in the circumstances because it involved "a RICO violation whose central purpose was to prevent the collection of a claim or judgment." *Stochastic,* 995 F.2d at 1166. *Stochastic* actually expanded the holding in *Bankers Trust* quite substantially because in *Stochastic,* as here, there was no pending bankruptcy proceeding. In fact, the plaintiff in *Stochastic* invoked *Bankers Trust* to support its argument that its lost debt damages were recoverable because the only bankruptcy proceeding that had occurred was terminated without any payment to creditors. *Stochastic,* 995 F.2d at 1165. The panel rejected this argument. *Id.*

**27.** *Stochastic,* 995 F.2d at 1165.

**28.** *Id.* at 1166.

**29.** *Id.* at 1165–66; *see also First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 768 (2d Cir.1994) (characterizing and reaffirming the *Stochastic* holding).

**30.** Berry Aff. ¶ 6.

**31.** *Id.* ¶ 7.

**32.** Plaintiffs' invocation of language in *GICC Capital Corp. v. Technology Finance Group, Inc.,* 30 F.3d 289 (2d Cir.1994), to the effect

### 3. Legal Fees Injury

Plaintiffs seek also to recover under RICO the "attorneys fees and expenses incurred in prosecuting their objections to Sohrab's fraudulent Chapter 7 petition in the *First Capital v. Vahabzadeh* adversary proceeding."[33] This allegation and its supporting proof are sufficient to confer standing for the substantive RICO claim against Sohrab and the RICO conspiracy claim against Sohrab, Ahmed, Afsar, and Schlegelmilch, but not the substantive RICO claim against Afsar.

*Bankers Trust* and *Stochastic* offer substantial guidance on this point as well. Since *Bankers Trust*, it has been well settled that legal fees may constitute RICO damages when they are the proximate consequence of a RICO violation.[34] The defendants there had initiated fraudulent lawsuits against the plaintiffs in South Carolina and New York and allegedly bribed the judge in the South Carolina action, all in an effort to frustrate collection of the debt owed the plaintiff.[35] The Second Circuit held that the plaintiff could recover as RICO damages (1) legal fees and other expenses incurred in fighting the frivolous lawsuits in New York, (2) legal fees and other expenses spent in overcoming bribe-induced decisions in the South Carolina action, and (3) legal fees and other expenses incurred in obtaining a revocation of the initial reorganization plan.[36] In *Stochastic*, the court held that the plaintiff could recover as RICO damages legal fees and other expenses incurred in its attempt to collect the state court judgments,[37] but that it could not recover its fees and expenses incurred in originally obtaining those judgments.[38]

### a. Substantive RICO Claim: Sohrab

▮ Among the scores of predicate acts allegedly committed by Sohrab, the following are particularly relevant: (1) on July 17, 1997, Sohrab filed a materially false bankruptcy petition[39] in violation of 18 U.S.C. § 152(2); (2) on July 17, 1997, Sohrab transferred $95,000 he held in an account at Bank of New York in the name of Vahabzadeh & Co. to an account at Credit Suisse in Zurich controlled by his wife Ninni's brother, Ali Ladjevardi,[40] in violation of 18 U.S.C. § 152(1) and 18 U.S.C.

---

that "the possibility of a state court action ... does not preclude Capital's standing to pursue federal claims in federal court," *id.* at 293, is unpersuasive. *GICC Capital* did not address specifically the issue of lost debt injury. Rather, it focused on whether the plaintiff's injury was indirect or direct. *See id.* at 290 (noting that the district court held that plaintiff lacked RICO standing because the alleged looting proximately caused harm only to the looted corporation, not its creditors); *id.* at 293 (noting that defendants contended that plaintiff's injury was indirect because the looting did not specifically target plaintiff as opposed to other creditors). Furthermore, and with all due respect, the *GICC* panel appears to have misread the holdings of *Stochastic* and *Bankers Trust*, apparently assuming that these cases held that the plaintiffs could collect their lost debt injury, when in fact they held the opposite. *See id.*

33. Am. Cpt. ¶¶ 163(b), 178(b).

34. *Stochastic*, 995 F.2d at 1167; *Bankers Trust*, 859 F.2d at 1105.

35. *See Bankers Trust*, 859 F.2d at 1099.

36. *Id.* at 1105.

37. Although the *Stochastic* opinion does not make this clear, presumably these efforts to collect on the state court judgments were distinct from the federal court RICO action itself.

38. *Stochastic*, 995 F.2d at 1167.

39. Am. Cpt. ¶ 147(c).

40. *Id.* ¶ 162(g). After hearing testimony in the *First Capital v. Vahabzadeh* adversary proceeding, Judge Gallet determined as a matter of fact that Sohrab made this conveyance. Berry Aff. Ex. 2, at 15–16, 39–40.

§ 152(7); (3) on May 13, 1997, Sohrab and Ninni executed a separation agreement in which Sohrab, without consideration, ostensibly waived a claim to an equitable distribution of his and Ninni's marital property [41] in violation of 18 U.S.C. § 152(1) and 18 U.S.C. § 152(7); (4) on September 4, 1997, Sohrab made false statements concerning his family's financial affairs and his interest in Soleyman's Estate and in the Vahabzadeh family business at a meeting of his creditors [42] in violation of 18 U.S.C. § 152(3); and (5) on September 16, 1997, Sohrab made similar false statements under oath during an examination by his creditors conducted under Bankruptcy Rule 2004 [43] in violation of 18 U.S.C. § 152(3).

▉▉▉ There is at least a genuine issue of fact regarding whether these predicate acts proximately caused plaintiffs to incur legal fees and other expenses in prosecuting their objections to Sohrab's bankruptcy petition in the *First Capital v. Vahabzadeh* adversary proceeding. A

"RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." [44] It seems entirely foreseeable that these acts designed to hide assets and obtain a wrongful discharge of debts would cause creditors to expend money to block such a discharge and recover any fraudulently transferred assets. In other words, the adversary proceeding, with its attendant costs, may be viewed as an expected and natural consequence of the type of conduct allegedly engaged in by Sohrab. And it seems that the alleged predicate acts enumerated above played a substantial role in plaintiffs' decision to pursue the adversary proceeding: all of them were mentioned by Judge Gallet as grounds upon which plaintiffs sought denial of Sohrab's petition. [45] Accordingly, plaintiffs have standing to pursue their substantive RICO claim against Sohrab because of the Legal Fees injury. [46]

---

**41.** Am. Cpt. ¶ 152(e).

**42.** *Id.* ¶ 147(d).

**43.** Am. Cpt. ¶ 147(e)-(g).

**44.** *Hecht,* 897 F.2d at 23–24.
Courts often speak of "transaction causation" and "loss causation" in fraud cases. *See, e.g., Moore,* 189 F.3d at 169–70. "Transaction causation" means that the misrepresentation at issue must have led the plaintiffs to enter into the transaction at issue. *See id.* "Loss causation" means that the misrepresentation must be both an actual and a proximate cause of the loss that the plaintiffs suffered. *See id.* In the Court's view, it would not be advisable to apply this standard to the case at hand because the bankruptcy frauds at issue do not involve the defendant making misrepresentations in order to lure the plaintiffs into an injurious transaction. Rather, the misrepresentations and acts of fraud involved here allegedly were aimed at evading the lawful collection efforts of plaintiffs, making concepts like "transaction causation" inapplicable.

As for "loss causation," the standard quoted from *Hecht* above covers the same bases. *See id.* at 175 (Calabresi, J., concurring) (noting, with respect to loss causation, that "plaintiffs must ... demonstrate the existence of all three of the traditional common-law elements of causation (but-for, causal link, and proximate cause)" and that " 'loss causation' ... is, in fact, not significantly different from the standard tort law requirement that a defendant's acts cause not only the accident but also the injury to the plaintiff that followed the accident"). There is no real question that plaintiffs would not have incurred the expense of the adversary proceeding but for Sohrab's fraudulent transfers and acts of concealment. Thus, the Court addresses only the related concepts of causal link and proximate cause (which often are conflated into one standard) in the body of this opinion.

**45.** Berry Aff. Ex. 2, at 5–6.

**46.** The Court notes, however, that because Sohrab is not a moving defendant and did not

### b. RICO Conspiracy Claim: Sohrab, Afsar, Ahmed, and Schlegelmilch

 In light of the above, the standing question regarding the RICO conspiracy claim can be disposed of without much difficulty. To have standing to bring a RICO conspiracy claim, the plaintiffs must demonstrate that at least one Section 1961 predicate act taken in furtherance of the RICO conspiracy proximately caused injury to their business or property.[47] Here, plaintiffs' conspiracy allegations encompass the predicate acts of Sohrab discussed above.[48] And there is at least an issue of fact regarding whether they were taken in furtherance of a conspiracy formed by Sohrab, Ahmed, Afsar, and Schlegelmilch in Geneva,[49] which had as its object "to transfer and conceal assets of Sohrab in contemplation of and during Sohrab's bankruptcy case to the detriment of plaintiffs, the Chapter 7 Trustee and Sohrab's other creditors."[50] Thus, the Legal Fees injury flowing from Sohrab's predicate acts confers standing on plaintiffs on their RICO conspiracy claim as well.

### c. Substantive RICO Claim: Afsar

 Plaintiff alleges that Afsar committed the following predicate acts: (1) at an unspecified time in early 1997, she received assets from Sohrab, which he purportedly inherited from Soleyman's Estate and transferred to her overseas, all in violation of 18 U.S.C. § 152(7);[51] (2) on September 16, 1998, she falsely stated in a letter sent to Sohrab and intended for the bankruptcy court that she had no documents in her possession relating to Soleyman's Estate or the financial affairs of her late husband;[52] (3) on March 24, 1998, as part of the adversary proceeding, she submitted an affidavit stating falsely that Soleyman had been an Iranian citizen and not a Swiss citizen, presumably in violation of 18 U.S.C. § 152(3);[53] (4) she caused Russell McRory, in his capacity as her

---

make arguments for himself regarding plaintiffs' standing on their claims against him, this determination is without prejudice to Sohrab's raising the issue again at the appropriate time if he has not waived this defense already.

47. See Beck, 529 U.S. at 507, 120 S.Ct. 1608; Hecht, 897 F.2d at 25; In re Crazy Eddie Sec. Litig., 714 F.Supp. 1285, 1291–92 (E.D.N.Y. 1989).

48. He allegedly committed them after January 16, 1997, the date on which the conspiracy is alleged to have begun. Am. Cpt. ¶ 167.

49. There is a genuine issue of fact regarding the existence of this conspiracy despite the lack of direct evidence regarding formation of the conspiracy at the January 16, 1997 meeting. See Berry Aff. Ex. 9, Sohrab Dep. 10 (indicating that Ahmed called the meeting to explain that there were no assets left in Soleyman's Estate and to recommend that the family repudiate the estate). Given the virtual impossibility of uncovering direct proof regarding the formation of a conspiracy, it is commonplace to infer the existence of a conspiracy from circumstantial evidence, including the apparently concerted action of co-conspirators. E.g., United States v. Bin Laden, 92 F.Supp.2d 225, 242 (S.D.N.Y.2000). Here, plaintiff produced letters to Sohrab intended for the bankruptcy court, written by Ahmed, his alleged alter ego Afiwa, and Afsar. See Berry Aff. Exs. 13, 15, 16. A reasonable trier of fact might conclude that these letters illustrate a concerted effort to "stonewall" the bankruptcy court. While an admittedly thin reed to hang on, this evidence, along with more general evidence regarding the extent to which the Vahabzadeh family businesses are intertwined, see Barry Aff. Ex. 2 passim, is sufficient to create an issue of fact regarding the existence of the conspiracy, at least for purposes of this standing determination.

50. Am. Cpt. ¶ 165.

51. Am. Cpt. ¶¶ 117, 148, 149.

52. Id. at 150.

53. Id. at 152.

attorney, to submit a declaration dated to the bankruptcy court, dated March 4, 1998, in which he stated that Soleyman, at the time of his death, owned no bank, brokerage, investment or other type of account, presumably in violation of 18 U.S.C. § 152(3);[54] (5) she caused Mr. McRory, in his capacity as her attorney, to submit a declaration to the bankruptcy court, dated June 12, 1998, in which he stated that Schlegelmilch had informed him that there were no assets in Soleyman's Estate at the time of his death beyond personal effects, furnishings in his home and nonworking automobiles, both over 20 years old, presumably in violation of 18 U.S.C. § 152(3);[55] and (6) on various dates between 1997 and 1999, she sent money to Sohrab, allegedly out of assets unlawfully transferred to her in 1997 by Sohrab, in violation 18 U.S.C. § 152(7).[56] For the sake of convenience, the Court will analyze the predicate acts listed above in two groups: the "Adversary Proceeding Predicate Acts" (including predicate acts (2) through (5)) and the "Transfer Predicate Acts" (including predicate acts (1) and (6)).

Plaintiffs have failed to demonstrate an issue of fact regarding whether the Adversary Proceeding Predicate Acts proximately caused Legal Fees injury. As defendants point out, these predicate acts all occurred after commencement, and as part, of the adversary proceeding for which legal fees and expenses are claimed as RICO injury.[57] While in other circumstances the alleged dilatory tactics might have increased the costs of prosecuting the adversary proceeding, here there is undisputed evidence that plaintiffs' attorney charged them a flat fee for this action.[58] Thus, it is impossible for the Court to see how these predicate acts possibly could have increased the legal expenses incurred by plaintiffs in pursuing denial of Sohrab's discharge.

■ Nor do the Transfer Predicate Acts support plaintiffs' standing on their substantive RICO claim against Afsar. If Afsar had committed such acts, it would be easy to see how they might proximately have caused an increase in plaintiffs' legal fees for many of the same reasons discussed above with respect to Sohrab's predicate acts. However, plaintiffs have failed adequately to plead, much less provide any factual support for, these predicate acts.

■ "Section 152(7) [of the Bankruptcy Code] makes it unlawful for any person, in contemplation of his [or her] bankruptcy or that of another person or corporation, to transfer or conceal knowingly and fraudulently 'his [or her] property or the property of such other person or corporation.' By its plain language, therefore, Section 152(7) makes it a crime for a person to transfer or conceal knowingly an fraudulently ... the property of another person [in contemplation of that other person's bankruptcy] ...."[59]

■ Rule 9(b) of the Federal Rules of Civil Procedure applies to allegations of bankruptcy fraud under Section 152(7).[60]

---

54. *Id.* at 153.

55. *Id.* at 154.

56. *Id.* at 148, 149.

57. The *First Capital v. Vahabzadeh* adversary proceeding commenced on November 3, 1997. Berry Aff. Ex. 6, at 5. These predicate acts all occurred in the context of plaintiffs' attempts to gather discovery in that action. *See* Am. Cpt. ¶¶ 150–154.

58. McRory Aff. Ex. G, Berry Dep. 113–14.

59. *United States v. Sabbeth,* 262 F.3d 207, 212–13 (2d Cir.2001) (citing 18 U.S.C. § 152(7)).

60. *FCAM I,* 150 F.Supp.2d at 632–33; *see also Browne v. Abdelhak,* No. Civ. A. 98–6688, 2000 WL 1201889, at *8 (E.D.Pa. Aug. 23, 2000) (Rule 9(b) applies to allegations of bankruptcy fraud under 18 U.S.C. § 152(7)); *In re Sattler's, Inc.,* 73 B.R. 780, 787 n. 7

While the original complaint provided detail regarding when money allegedly was transferred *to* Sohrab from Afsar, it was silent on when the money was received *from* the debtor.[61] The amended complaint adds a mountain of new allegations asserting, on information and belief, that Soleyman owned assets at the time of his death and that Sohrab received an inheritance.[62] Nevertheless, there still is nothing in the amended complaint detailing when [63] or how [64] any transfer to Afsar was accomplished. These omissions are particularly glaring because Afsar's receipt of Sohrab's assets in contemplation of his bankruptcy is the gravamen of the alleged predicate act.[65] Without any rational and specific allegations regarding Afsar's receipt of Sohrab's assets, predicate act (1) fails for lack of particularity under Rule 9(b). Furthermore, without specific allegations regarding Afsar's receipt of Sohrab's assets, plaintiffs' allegations regarding Afsar's subsequent transfers of funds to Sohrab in 1997 through 1999 (making up predicate act (6) above) also fail for lack of particularity. Plaintiffs have failed to allege sufficient, specific facts supporting their contention that the ultimate source of the transfers was Sohrab and not Afsar herself. If she was the source of the funds, there was no violation of Section

(Bankr.S.D.N.Y.1987) ("[B]ankruptcy fraud ..., like other RICO violations predicated in fraud, must be pleaded with particularity.").

**61.** *FCAM I*, 150 F.Supp.2d at 632–33.

**62.** Am. Cpt. ¶¶ 149, 150.

**63.** Plaintiffs allege only that it happened in "early 1997." Am. Cpt. ¶ 117. Their argument that they have narrowed the time of the transfer to between July 1, 1997 and July 16, 1997 is nonsensical and at odds with the allegations of the complaint. *See* Pl. Mem. 29. As discussed immediately below, the fact that money was coming to Sohrab from Switzerland does nothing to establish when or how Afsar allegedly received assets from Sohrab.

Plaintiffs vehemently contend that their allegations regarding one episode satisfy Rule 9(b)'s particularity requirements. In paragraph 149(b)(iii) of the amended complaint, plaintiffs allege that "[i]n early July 1997— after Soleyman's death and just before Sohrab's bankruptcy filing—Sohrab stated to his account officer at J.P. Morgan ... that he had himself remitted $5,000 to his J.P. Morgan account .... The only $5,000 transfer remitted to Sohrab's account at the time was a wire transfer from ABN AMRO in Geneva which ... originated from an unidentified "un de nos clients." Beginning shortly after Soleyman's death[ ] and continuing through his bankruptcy, Sohrab received several wire transfers from the unnamed "un de nos clients" account at ABN AMRO in Geneva. In his bankruptcy case,

Sohrab testified that he "might have" told [his account executive] that he had sent these funds from Europe." This allegation does nothing to identify when Sohrab transferred, and Afsar unlawfully received, his purported inheritance from Soleyman's Estate.

**64.** Plaintiffs do allege that Sohrab "transferred his statutory rights to his mother, Afsar and brother, Iradj, and to his other siblings," and that he "waived his statutory interest in the real estate, bank accounts, corporate stock ..., and other business interests ... held in Soleyman's Estate," "result[ing] in Afsar and Iradj ... receiving the portions of Soleyman's Estate which would have otherwise devolved to Sohrab." Am. Cpt. ¶¶ 117–118. Yet this allegation is flatly contradicted by plaintiffs simultaneous allegation that "Sohrab did not disclaim or renounce any participation in Soleyman's [Estate]," *id.* at 149(b)(i), and the undisputed fact that Afsar and Sohrab's siblings did in fact disclaim their interests in Soleyman's Estate. *See, e.g.*, *First Nationwide Bank*, 27 F.3d at 771 (the principle that unwarranted deductions of fact are not credited applies with special force in fraud cases governed by Rule 9(b)). Plaintiffs appear to contend also that Sohrab did in fact inherit the entirety of Soleyman's Estate, which he then transferred to Afsar overseas. But there are no specifics regarding when or by what means this alleged transfer took place.

**65.** *See Sabbeth*, 262 F.3d at 212–13.

152(7). Accordingly, the Transfer Predicate Acts do not support plaintiffs' standing on their substantive RICO claim against Afsar.

For the foregoing reasons, plaintiffs lack standing to bring their substantive RICO claim against Afsar.

## II. Personal Jurisdiction

■ The moving defendants challenge also the Court's personal jurisdiction over Ahmed, Afsar, and Afiwa. In its prior opinion, the Court disposed of the jurisdictional issue, reasoning that if the RICO conspiracy count were sufficient, a *prima facie* showing of personal jurisdiction over Afsar, Ahmed, and Schlegelmilch would be established by virtue of their status as alleged co-conspirators of Sohrab, over whom personal jurisdiction was and is undisputed.[66] As defendants correctly point out, however, more than a *prima facie* showing of conspiracy is required to establish personal jurisdiction over an alleged co-conspirator under New York's long-arm statute.[67] Accordingly, the Court will address its personal jurisdiction over Afsar, Ahmed, and Afiwa before proceeding further.

## A. Applicable Standard

■ "In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion."[68] Here, the Court has not conducted an evidentiary hearing but previously authorized the parties to conduct discovery on jurisdictional issues.[69]

■ In *Ball v. Metallurgie Hoboken–Overpelt, S.A.,*[70] the Second Circuit made clear that, in the face of a challenge to a district court's personal jurisdiction over a defendant, "the plaintiff's obligation varies depending on the procedural posture of the litigation."[71] Prior to discovery, a plaintiff challenged by a Rule 12(b)(2) motion may defeat the motion by

66. *FCAM I*, 150 F.Supp.2d at 631 & n. 12.

67. *E.g., Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95, 119–20 (E.D.N.Y.2000); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 26 F.Supp.2d 593, 602 (S.D.N.Y. 1998); *see also Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981).

68. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *accord Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir.1999); *Roberts–Gordon, LLC v. Superior Radiant Prods., Ltd.,* 85 F.Supp.2d 202, 208 (W.D.N.Y.2000); *Universal Marine Med. Supply, Inc. v. Lovecchio,* 8 F.Supp.2d 214, 218 (E.D.N.Y.1998).

69. Plaintiffs complain that defendants have obstructed their discovery efforts. They argue that because defendants have deprived them of needed discovery, they should not have to bolster their jurisdictional allegations with factual support, apparently agreeing with defendants that after discovery but prior to an evidentiary hearing or trial, some factual support normally is required to survive a jurisdiction-testing motion. *See* Pl. Mem. 41. This motion is not the proper context in which to raise such concerns, as plaintiffs could have moved the Court to compel discovery at the time of the alleged infractions. In any case, the matters about which plaintiffs complain all revolve around ownership and control of bank accounts overseas, *see* Pl. Mem. 3, Berry Aff. Ex. 3 ¶¶ 41, 42, 43, 44, 77, 101; *id.* Ex. 5, at 3, issues which are not material to the Court's jurisdictional determinations here. Accordingly, plaintiffs' argument does not convince the Court that it should apply the standard applicable to Rule 12(b)(2) motions prior to jurisdictional discovery.

70. 902 F.2d 194 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

71. *Id.* at 197.

"pleading in good faith legally sufficient allegations of jurisdiction." [72]

"Prior to the holding of an evidentiary hearing, the plaintiff need only make a *prima facie* showing that jurisdiction exists. Where as here, there has been discovery on the issue of [personal] jurisdiction, the plaintiff's *prima facie* showing must include 'an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant.' The plaintiff cannot rely merely on conclusory statements [73] or allegations; rather, the *prima facie* showing must be 'factually supported.'" [74]

A *prima facie* case is established if the plaintiff presents sufficient evidence to defeat a motion for directed verdict. [75] In other words, the standard is akin to that

---

**72.** *Id.*

**73.** *See Barrett v. United States*, 646 F.Supp. 1345, 1350 (S.D.N.Y.1986); *accord Dardana Ltd. v. Yuganskneftegaz*, No. 00 Civ. 4633(DAB), 2001 WL 1131987, at *2 (S.D.N.Y. Sept. 24, 2001); *Coan v. Bell Atl. Sys. Leasing Int'l, Inc.*, 813 F.Supp. 929, 942 (D.Conn.1990); *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184, 185 (2d Cir.1998); *Cornell v. Assicurazioni Generali S.p.A.*, No. 97 Civ. 2262, 2000 WL 1099844, at *1 (S.D.N.Y. Aug. 7, 2000) (quoting *Jazini*, 148 F.3d at 185).

**74.** *Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*, No. 00 Civ. 5663(MBM), 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) (quoting *Ball*, 902 F.2d at 197) (footnote added); *accord Morrison v. N.Y. State Div. for Youth Children & Family Servs.*, No. 98 Civ. 643, 2000 WL 532762, at *1 (S.D.N.Y. Apr. 25, 2000); *Gulf Union Ins. Co. Saudi Arabia v. Bella Shipping Co.*, No. 91 Civ. 2814(PKL), 1994 WL 455117, at *2 (S.D.N.Y. Aug. 22, 1994).

Certain language from recent Second Circuit opinions, if taken out of context, might suggest that no factual support is required on Rule 12(b)(2) motion after jurisdictional discovery but before an evidentiary hearing or trial. *See, e.g., Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996) (indicating that, after jurisdictional discovery, but before an evidentiary hearing, " 'the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant,' " without adding language from *Ball* indicating that factual support is required (quoting *Ball*, 902 F.2d at 197)), *cert. denied*, 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996); *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir.1999) (same). Without a specific holding on this point, the Court declines to impute to the Second Circuit a view that would require a district court to proceed to an evidentiary hearing or trial on the issue of personal jurisdiction when the plaintiff, with full notice of the nature of the jurisdictional challenge, cannot even demonstrate a genuine issue of material fact on the pertinent issue. Moreover, the Second Circuit recently recognized the distinction between a Rule 12(b)(2) motion attacking the plaintiff's theory of jurisdiction and one attacking the facts supporting the jurisdictional theory. *See Credit Lyonnais Secs.*, 183 F.3d at 153; *cf. Distefano v. Carozzi N.A., Inc.*, 286 F.3d 81, 84 (2d Cir.2001) ("Where, as here, a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant. We construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in his favor." (citations and internal quotation marks omitted)). Surely, resolving all doubts in the plaintiff's favor is not the same as blindly crediting all allegations regardless of their factual support. Any rule requiring such blindness would ignore the basic notion that "a motion to dismiss pursuant to [Rule] 12(b)(2) based on lack of personal jurisdiction is 'inherently a matter requiring resolution of factual issues outside the pleadings.' " *Yellow Page Solutions*, 2001 WL 1468168, at *1 (quoting *Pilates, Inc. v. Pilates Inst., Inc.*; 891 F.Supp. 175, 178 n. 2 (S.D.N.Y.1995)); *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Sup.2d 722, 731 (S.D.N.Y.2001).

**75.** 2 MOORE'S FEDERAL PRACTICE § 12.31[5], at 12–47 (quoting *Cable/Home Communication Corp. v. Network Prods., .Inc.* 902 F.2d 829, 855 (11th Cir.1990)).

on a motion for summary judgment.[76] The pleadings, documents, and other evidentiary materials must be " 'construed in the light most favorable to plaintiff and all doubts are resolved in its favor.' "[77] Thus, once a plaintiff has alleged facts that, if proved, would support jurisdiction, a defendant cannot win a Rule 12(b)(2) motion merely by denying plaintiff's allegations. Rather, the defendant's moving papers must " 'entirely refute the plaintiff's allegations.' "[78]

## B. Jurisdictional Facts

The following facts are drawn from the amended complaint, affidavits, and documentary exhibits submitted by both parties.

### 1. Afsar

Afsar is a resident and citizen of Switzerland.[79] She had an apartment at 15 West 53rd Street in New York City from 1985 through 1997.[80] In the amended complaint, plaintiffs assert that title was held by Savco,[81] of which Afsar allegedly was an officer and part owner. Other evidence suggests that Afsar owned the apartment at the time of its sale on June 23, 1997.[82]

From 1978 through 1996, Afsar had bank accounts at J.P. Morgan in New York that held as much as $25 million to $30 million. From the mid–1980's through the present, she has maintained an account at the New York branch of ABN AMRO, N.V.[83] Although plaintiffs provide no evidentiary support for their allegations about Afsar's bank accounts, defendants apparently do not dispute them.[84]

Plaintiffs allege that Afsar made many business trips to New York from 1980 to the present and that she has engaged in numerous "New–York situated" business transactions, both for her own account and on behalf of her husband, Soleyman, for whom she held a power of attorney over his accounts at the New York branch of ABN AMRO, N.V. They contend also that she engaged in New–York situated business activities through her nominee and relative, Dara Vahabzadeh, who holds power of attorney with respect to Afsar's account at the New York branch of ABN AMRO, N.V.[85] Plaintiffs do not, however, provide any detail at all regarding these alleged transactions. They do not hint as to their substance or timing within this twenty-year time period. Nor is there factual support provided for any of them.

On September 16, 1998, Afsar sent a letter intended for delivery to the United States Bankruptcy Court in Manhattan in which she falsely asserted that she had no documents relating to her deceased husband Soleyman's financial affairs.[86] Plaintiffs allege also that Afsar committed bankruptcy fraud outside of the country by

---

76. *See Kamen,* 791 F.2d at 1010–11 (noting that, while Rule 12(b) "speaking" motions may not be converted into a motion for summary judgment, cases under Rule 56 offer guidance in considering evidence outside the pleadings).

77. *Mantello v. Hall,* 947 F.Supp. 92, 96 (S.D.N.Y.1996) (*quoting CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986)).

78. *Id.* (*quoting Bialek v. Racal–Milgo, Inc.,* 545 F.Supp. 25, 33 (S.D.N.Y.1982)).

79. Am. Cpt. ¶ 8.

80. *Id.* ¶ 23(a).

81. Paragraph 23(a) of the amended complaint dubs Saveo a "defendant," but it is not otherwise named as a defendant, nor are jurisdictional allegations made regarding it.

82. Berry Decl. Ex. 19.

83. Am. Cpt. ¶ 23(b).

84. *See* Def. Mem. 39.

85. Am. Cpt. ¶ 23(c).

86. *Id.* ¶ 23(d).

fraudulently concealing, receiving, and hiding Sohrab's assets from his creditors and the Chapter 7 trustee.[87] As explained above, however, the latter allegations are not pleaded with the requisite particularity under Rule 9(b) and therefore may not be considered in determining the Court's personal jurisdiction over Afsar.

Finally, plaintiffs contend that Sohrab's acts within New York are attributable to Afsar because she is a co-conspirator in a RICO scheme with him.[88]

### 2. Ahmed

Ahmed is a resident and citizen of Switzerland.[89] Plaintiffs allege that he acted as a lender in "several transactions" in New York. They specify two: (1) a 1988 real estate loan of $700,000 to Kingsbrook Partners, which was secured by a mortgage covering land in Orange County, New York, and (2) the 1995 assignment of this mortgage to Sohrab's wholly-owned company, Vahabzadeh & Co., Inc.[90] Defendants' do not dispute these allegations.

Ahmed received promissory notes from Sohrab, including one in the amount of $850,000, on or about October 1, 1991. Furthermore, between late 1993 and 1995, Ahmed and Sohrab engaged in a series of "New York-connected" transactions aimed at making Sohrab appear judgment proof, apparently not in connection with the lawsuits underlying this action. During these transactions, Ahmed allegedly made numerous telephone calls and wrote letters to his attorney, Raymond McRory, whose office is in Garden City, New York, and to Sohrab, a resident of Manhattan. Addi-

tionally, Ahmed made a business trip to New York in May 1995, during which he received "telecopies" from Mr. McRory at the Carlyle Hotel in Manhattan.[91]

Plaintiffs allege also that Ahmed attended "six or seven" business meetings in New York with Mr. McRory between 1980 and the present. These meetings allegedly occurred "in 1990, 1992 and 1995 and possibly other years." Plaintiffs make no more specific allegations regarding these meetings.

Ahmed was involved in a business transaction in New York in August 1995 in which Sohrab and Peninsula, allegedly Sohrab's *alter ego,* conveyed part of their interests in certain limited partnerships to Satinwood and Sphinx Rock (the "Timberland & Tiburon Transaction"). The transaction closed in Garden City, New York. Certain documents related to the transaction were executed by Manou Faily in New York on behalf of Satinwood and Sphinx Rock.[92] Mr. McRory represented Brickellbush, Satinwood, and Sphinx Rock in the transaction[93] and discussed its structural aspects with Ahmed, who apparently acted on behalf of Sphinx Rock.[94]

Plaintiffs allege that Sphinx Rock and Satinwood are investment vehicles that are dominated and controlled by Ahmed. Defendants have admitted in prior motion papers that Sphinx Rock is owned by Ahmed and Satinwood by Sarlima, N.V., a Netherlands Antilles company also owned by him.[95] Plaintiffs produced a July 20, 1995 letter faxed from Manou Faily to Ahmed requesting that Ahmed cause Sphinx Rock and Sarlima to transfer the

87. *Id.* ¶ 23(e).

88. *Id.*

89. *Id.* ¶ 5.

90. *Id.* ¶ 22(a).

91. *Id.* ¶ 22(b).

92. Berry Decl. Ex. 22, McRory Dep. 159.

93. *See id.* at 162–66.

94. *See id.* at 166.

95. Berry Decl. Ex. 23.

funds required to consummate the Timberland & Tiburon Transaction to Mr. McRory's escrow account.[96] With respect to Sphinx Rock, plaintiffs allege further that in July or August 1995, Ahmed agreed on behalf of Sphinx Rock to transfer a portion of outstanding loan repayments it was entitled to as a result of the Timberland & Tiburon Transaction to Jens Schlegelmilch's company, Sintor Associated, without the knowledge or consent of N.V. Fides, the Netherlands Antilles corporation that is the managing director of Sphinx Rock.[97] They contend further that when Sphinx Rock and Satinwood later sold the Timberland and Tiburon properties, Ahmed caused at least part of the proceeds to be paid directly to himself.[98] Defendants produced no evidence to contradict plaintiffs' allegations regarding the connections between Ahmed and Sphinx Rock and Satinwood.

Plaintiffs allege further that Ahmed engaged in business in New York through his agents, Cimbalo and Sphinx Rock. They claim that Ahmed controlled Cimbalo, although ostensibly it was managed by a Dutch corporation known as ABN AMRO Trustcompany, N.V. and beneficially owned largely by Soleyman Vahabzadeh.[99] Plaintiffs only support for this contention is an allegation that when Cimbalo sought to enforce certain loan agreements, Ahmed dealt with Mr. McRory and Sohrab, who were involved in the attendant lawsuit.[100] Plaintiffs do not specify what

business, besides the Timberland & Tiburon Transaction, Sphinx Rock allegedly carried on in New York. Nor do they allege any further business activity in New York by Cimbalo.

On September 14, 1998, Ahmed sent a letter intended for delivery to the United States Bankruptcy Court in Manhattan in which he falsely asserted that he had no documents relating to his deceased brother Soleyman's financial affairs.[101]

Plaintiffs make some further miscellaneous allegations. They contend in the vaguest terms that "Ahmed traveled to New York in early May 1997 and met with his nephew, Sohrab, in connection with the transactions involved in Sohrab's bankruptcy and the instant lawsuit." [102] They specify nothing further regarding the nature of the transactions. Plaintiffs contend also that Ahmed, through various agents including Manou Faily, Sohrab, Iradj, Brickellbush, and Mr. McRory, engaged in "numerous New York-connected transactions." [103] The only such transaction mentioned is the sale of Afsar's apartment in New York. Further, Ahmed allegedly received funds transferred from Mr. McRory's escrow accounts in New York on August 25, 1988, March 6, 1990, and sometime in 1993.[104] Plaintiffs produced factual support for their assertion that Ahmed received funds transferred from Mr. McRory's account,[105] but failed to produce a shred of evidence regarding Ahmed's maintenance of accounts in New York.

**96.** *Id.* Ex. 24. Originally, the transaction was to be between Sohrab/Peninsula and Brickellbush. Plaintiffs produced deposition testimony suggesting that Ahmed may have instructed Mr. McRory to substitute "Sphinx Rock" for "Brickellbush" on at least one document relating to the transaction. *Id.* Ex. 22, McRory Dep. 170.

**97.** Am. Cpt. ¶ 84.

**98.** *Id.* ¶¶ 84, 100.

**99.** *Id.* ¶ 22(e).

**100.** *Id.* ¶ 22(f).

**101.** *Id.* ¶ 22(k).

**102.** *Id.* ¶ 22(g).

**103.** *Id.* ¶ 22(h).

**104.** *Id.* ¶ 22(i).

**105.** Berry Aff. Ex. 20.

Finally, plaintiffs contend that Sohrab's acts within New York are attributable to Ahmed because he is a co-conspirator in a RICO scheme with Sohrab.

### 3. Afiwa

Afiwa is a Panamanian corporation having its principal place of business in Geneva, Switzerland.[106] Allegedly, Afiwa is owned by Ahmed and is an operating company and investment vehicle for him. Plaintiffs allege that Ahmed has manipulated his finances in an attempt to render himself judgment proof and that he uses funds controlled by Afiwa for his personal expenses and personal investment.[107] They contend also that Ahmed regularly has channeled funds due to himself and Cimbalo into Afiwa's accounts.[108] Allegedly, Ahmed has unilateral control over all property held in the name of Afiwa.[109] Defendants apparently do not dispute these allegations.

On September 14, 1998, Afiwa sent a letter intended for delivery to the United States Bankruptcy Court in Manhattan in which it falsely asserted that it had no documents relating to Soleyman's Estate or financial affairs.[110]

106. Am. Cpt. ¶ 7.

107. Id. ¶ 7.

108. Id. ¶ 182.

109. Id.

110. Id.

111. Laborers Local 17, 26 F.Supp.2d at 600 (citing cases).

112. Id. at 601.

113. Id.

114. Kernan, 175 F.3d at 240 (quoting Metropolitan, 84 F.3d at 567).

115. Id. ¶¶ 23, 22. As defendants point out, New York courts do not agree on whether a

### C. Jurisdictional Analysis

#### 1. Basics

RICO does not provide for international service of process.[111] "Plaintiffs asserting RICO claims against foreign defendants must rely on the long-arm statute of the state in which they filed suit."[112] The Court must focus on the defendants' contacts with the forum state, not the United States as a whole.[113] Accordingly, the Court will apply New York jurisdictional law and analyze the defendants' contacts with New York.

The jurisdictional inquiry has two parts. " 'First, [the court] must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process.' "[114]

#### 2. Section 301

[28–30] Plaintiffs baldly allege that this Court has personal jurisdiction over Afsar and Ahmed because they are or have been "doing business" in New York for purposes of Section 301 of New York's CPLR.[115] However, plaintiffs fail to ad-

natural person may be subject to "doing business" jurisdiction under Section 301. Compare ABKCO Indus., Inc. v. Lennon, 52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dept.1976), with Nilsa B.B. v. Clyde Blackwell H., 84 A.D.2d 295, 445 N.Y.S.2d 579 (2d Dept.1981). In Laufer v. Ostrow, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982), the New York Court of Appeals sidestepped the issue, finding that, even assuming that an individual who in fact is doing business is subject to jurisdiction, the defendant's in-state activity was not sufficient to satisfy the doing-business standard. 55 N.Y.2d at 313–14, 449 N.Y.S.2d at 460–61, 434 N.E.2d 692. As in Laufer, the Court need not decide this question because plaintiffs have not made a prima facie showing that either Afsar or Ahmed was "doing business" in New York.

dress this ground for jurisdiction in their memorandum of law, and the Court considers it waived.[116] In any case, plaintiffs do not allege instate activity that is sufficiently " 'continuous, permanent, and substantial' "[117] to subject Afsar or Ahmed to jurisdiction under Section 301.

With respect to Afsar, her ownership and sale of one piece of New York real estate does not constitute "business," and plaintiffs do not even allege that she ever took up residence in the apartment. Plaintiffs allege that she made business trips to New York and engaged in numerous business transactions here between 1980 and the present, but they provide absolutely no detail.[118] Afsar's maintenance of New York bank accounts is not alone sufficient to subject her to jurisdiction under Section 301.[119] Nor do her accounts alter her aggregate state activities to such an extent that the Court can say that she is " 'present' in the State 'not

occasionally or casually, but with a fair measure of permanence and continuity.' "[120]

Plaintiffs allege at best that Ahmed engaged in seven or eight New York-related business transactions[121] and made eight business trips to New York in the past twenty years, and that he "controlled" Cimbalo and point to some of Cimbalo's activities in New York, although they do not make allegations sufficient to establish whether Cimbalo acted as Ahmed's agent in New York or was merely his *alter ego*. They make no allegations at all regarding what business Sphinx Rock carried on in New York, except for the Timberland & Tiburon Transaction.

Even if a foreign individual may be subject to personal jurisdiction in New York on the basis of his or her "doing business" within the state, plaintiffs have not made a *prima facie* showing that either Afsar or Ahmed engaged in the type of continuous

---

**116.** *E.g., Hearst Corp. v. Goldberger*, No. 96 Civ. 3620(PKL) (AJP), 1997 WL 97097, at *8 (S.D.N.Y. Feb. 26, 1997) (plaintiff waived argument under Section 301 when it failed to include any such argument in opposition brief) (citing *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 & n. 2 (2d Cir.), *cert. denied*, 519 U.S. 816, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996), and *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1214 (2d Cir. 1987)).

**117.** *Jacobs*, 160 F.Supp.2d at 731 (quoting *Wiwa v. Royal Dutch Petroleum, Co.*, 226 F.3d 88, 95 (2d Cir.2000), *cert. denied*, 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001)).

**118.** In any case, the Court notes that a mere series of business transactions over a twenty-year period would not rise to the level of continuous and systematic activity within the state. *See, e.g., Laufer*, 55 N.Y.2d at 310, 449 N.Y.S.2d at 458–59, 434 N.E.2d 692. Considered alone or in conjunction with these transactions, multiple business trips to New York would not change the analysis. *See, e.g., Jacobs*, 160 F.Supp.2d at 733 (four to five business visits per year insufficient to establish

jurisdiction under Section 301) (collecting cases).

**119.** *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 35, 563 N.Y.S.2d 739, 742–43, 565 N.E.2d 488 (1990); *Nemetsky v. Banque De Developpement De La Republique Du Niger*, 48 N.Y.2d 962, 964, 425 N.Y.S.2d 277, 277, 401 N.E.2d 388 (1979); *see also Bank of Am. v. Whitney Cent. Nat'l Bank*, 261 U.S. 171, 43 S.Ct. 311, 67 L.Ed. 594 (1923) (holding that Louisiana bank that had continuous, regular, and active deposit accounts with six New York banks was not "doing business" in New York).

**120.** *Landoil Res.*, 77 N.Y.2d at 34, 563 N.Y.S.2d at 741, 565 N.E.2d 488 (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917)).

**121.** Plaintiffs do make the vague and conclusory allegation that Ahmed engaged in "numerous New York-connected transaction" through various agents. Am. Cpt. ¶ 22(h). This sort of allegation does not contribute anything to their *prima facie* showing of jurisdiction.

and systematic activity required by Section 301.

## D. Section 302

### 1. Afsar

Plaintiffs maintain that the Court has personal jurisdiction over Afsar under Section 302(a), subdivisions 2 and 3, of the CPLR. Plaintiffs have not made a *prima facie* showing on either of these grounds.

#### a. Section 302(a), subd. 2

Section 302(a), subd. 2, provides in part that a New York court may exercise personal jurisdiction over any nondomiciliary who "in person or through an agent" commits a tortious act within the state when the plaintiff's claim directly relates to or arises out of that tortious act.[122] Plaintiffs assert that Afsar is subject to the Court's personal jurisdiction by virtue of her status as a co-conspirator of Sohrab in a RICO scheme.

"[B]oth state and federal courts have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his [or her] co-conspirators."[123] They do so by defining " 'agent' as used in CPLR § 302(a), subd. 2, broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators."[124]

To establish jurisdiction over a nondomiciliary defendant on the basis of the New York acts of a co-conspirator, the plaintiff must (1) establish a *prima facie* case of conspiracy, (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy, (3) demonstrate the commission of a tortious act in New York, and (4) demonstrate the requisite agency relationship between the nondomiciliary defendant and the in-state tortfeasor.[125]

Plaintiff alleges that Sohrab committed various bankruptcy frauds in New York, and the Court assumes the sufficiency of these allegations for the sake of argument. Putting aside the requirements of prongs one and two, however, plaintiffs have failed to make a *prima facie* showing regarding the fourth prong. "The requisite relationship between the defendant and its New York co-conspirator[ ] is established by a showing that:(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirator[ ] was to the benefit of the out-of-state conspirator[ ]; and (c) the co-conspirator[ ] acting in New York acted 'at the direction or under the control' or 'at the request or on behalf of' the out-of-state defendant."[126]

**122.** N.Y. C.P.L.R. § 302(a), subd. 2 (McKinney 2001).

**123.** *Laborers Local 17*, 26 F.Supp.2d at 601.

**124.** *Id.; accord Simon*, 86 F.Supp.2d at 119 (citing cases); *Madanes v. Madanes*, 981 F.Supp. 241, 261 (S.D.N.Y.1997); *Heinfling v. Colapinto*, 946 F.Supp. 260, 265 (S.D.N.Y. 1996).

**125.** *See Simon*, 86 F.Supp.2d at 119–20; *Laborers Local 17*, 26 F.Supp.2d at 601–02.

**126.** *Simon*, 86 F.Supp.2d at 120 (quoting *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1268–69 (S.D.N.Y.1991), in turn quoting *Dixon v. Mack*, 507 F.Supp. 345, 350 (S.D.N.Y.1980)); *see also Grove Press*, 649 F.2d at 122 (agency relationship for purposes of Section 302(a)(2) requires showing that "alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal"); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195,, 199, 522 N.E.2d 40 (1988) (for purposes of agency jurisdiction under Section 302(a), subd. 1, plaintiff must convince court that agent "engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of the [the out-of-state defendants] and that they exercised some control over [the agent] in the matter").

■ Afsar's awareness regarding the effects in New York of Sohrab's in-state bankruptcy fraud fairly can be inferred from the allegations in the complaint. The gist of plaintiffs' allegations is that she consciously assisted Sohrab in evading his creditors. Plaintiffs, however, have not made a sufficient showing regarding her direction or control of his bankruptcy frauds. The amended complaint, in the most conclusory of terms, alleges that she "dominates and controls the Estate of Soleyman Vahabzadeh." [127] There are no more specific factual allegations regarding her control of the Estate nor any suggestion of how her domination of it enabled or necessitated her control over Sohrab's allegedly tortious acts. As noted above, plaintiffs' bare, conclusory allegation of control is not sufficient to make out its *prima facie* showing of jurisdictional facts.[128] Similarly, putting aside the alleged transfers that were not pled with particularity, plaintiffs have failed to allege or demonstrate how Afsar benefitted from Sohrab's New York acts.

### b. Section 302(a), subd. 3

Section 302(a), subd. 3, confers personal jurisdiction over a nondomiciliary who commits a tort outside the state causing injury in the state when the plaintiff's claim arises out of that tortious act provided the nondomiciliary defendant either (i) regularly does or solicits business in New York, or engages in any persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered, in New York, or (ii) expects or reasonably should expect the tortious act to have consequences in New York and derives substantial revenue from interstate or international commerce.[129]

■ The out-of-state tortious act in question is Afsar's alleged act of mail fraud, which plaintiffs contend she committed when she sent a letter containing misrepresentations to the bankruptcy court in New York. There is no real dispute that plaintiffs adequately have alleged mail fraud. Defendants, however, contend that plaintiffs have not made a *prima facie* showing of injury within the state caused by Afsar's alleged tortious act. While defendants' specific argument is meritless, the Court nevertheless finds that plaintiffs have failed to establish that Afsar's act caused injury within the state.

■ Defendants argue that jurisdiction under Section 302(a), subd. 3, is improper because FCAM is a Delaware company and Oost–Leviense is a resident of Connecticut. Defendants' contention that there was no injury in New York because plaintiffs are not citizens or residents of New York is simply wrong. It is well settled that courts determining whether there is injury in New York apply the "situs-of-injury test, which asks them to locate the 'original event which caused the injury.'"[130] In the case of fraud, "the critical question is ... where the first

**127.** Am. Cpt. ¶ 112.

**128.** *See, e.g., Jazini,* 148 F.3d at 184, 185, *Barrett,* 646 F.Supp. at 1350; *cf. also Karabu v. Gitner,* 16 F.Supp.2d 319, 324 (S.D.N.Y. 1998) ("To make a prima facie showing of 'control,' a plaintiff's allegations must sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a 'primary actor' in the specific matter in question; control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation."); *Insight Data Corp. v. First Bank Sys.,*

*Inc.,* No. 97 Civ. 4896(MBM), 1998 WL 146689, at *6 (S.D.N.Y. Mar. 25, 1998) ("Conclusory allegations of an agency relationship between Card Services and U.S. Bancorp are insufficient to make out a prima facie showing of personal jurisdiction over U.S. Bancorp under § 301.").

**129.** N.Y. C.P.L.R. § 302(a), subd. 3(i)-(ii) (McKinney 2001).

**130.** *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 791 (2d Cir. 1999).

effect of the tort was located that ultimately produced the final economic injury," [131] and "the law of this Circuit is that plaintiff's reliance in New York on defendant's misrepresentations [transmitted from outside the state] fixes the situs of the injury in New York." [132]

Nevertheless, plaintiffs have failed to make a *prima facie* showing that Afsar's alleged mail fraud caused them injury in New York. As noted above, plaintiffs claim two types of injury: Lost Debt injury and Legal Fees injury. With respect to Legal Fees injury, Afsar's letter could not have caused plaintiffs greater expense in prosecuting the adversary proceeding because she wrote the letter after it began, and undisputed evidence shows that plaintiffs paid their lawyers a flat fee for the entire action. [133] As for the Lost Debt injury, plaintiffs have failed to demonstrate that their collection efforts have been frustrated as a proximate consequence of any of the defendants' predicate acts, much less Afsar's letter. [134] Furthermore, this letter did not stand in the way of their obtaining a denial of Sohrab's discharge in the adversary proceeding for which it was written. Certainly plaintiffs do not allege nor provide factual support for the notion that they relied on Afsar's letter. In short, because plaintiffs have failed to make a *prima facie* showing that the out-of-state tortious act identified by plaintiffs caused them in-state injury, the Court may not exercise personal jurisdiction over Afsar based on Section 302(a), subd. 3.

■ In sum, the Court cannot exercise personal jurisdiction over Afsar under Sections 302(a), subdivisions 2 or 3. The action therefore must be dismissed with respect to her. [135]

### 2. Ahmed

Read generously, plaintiffs' memorandum argues that the Court has *in personam* jurisdiction over Ahmed under Sections 302(a), subdivisions 1 through 3, based upon his own acts and those of his alleged agents. While they have made a *prima facie* showing that he is amenable to suit on the fraudulent conveyance claims found in Counts One and Two of the amended complaint, they have failed to do so with respect to the RICO conspiracy claim in Count Six.

### a. Section 302(a), subd. 1

■ Plaintiffs argue that Ahmed is amenable to suit in New York because he carried out the Timberland & Tiburon Transaction in New York through his agents, Sphinx Rock, Satinwood, Brickell-

---

131. *Id.* at 792.

132. *Palace Exploration Co. v. Petroleum Dev. Co.*, 41 F.Supp.2d 427, 435 (S.D.N.Y.1998); *see also Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899–900 (2d Cir.1980).

133. *See supra* text accompanying notes 58–59.

134. *See supra* text accompanying notes 30–32.

135. The above analysis focused exclusively on plaintiffs' RICO conspiracy claim against Afsar. Plaintiffs made no arguments regarding personal jurisdiction over her on the fraudulent conveyance claims in Counts Three and Four. Having disposed of the possibility of general jurisdiction under Section 301 and co-conspirator jurisdiction under Section 302(a)(2), it is clear that plaintiffs have failed to make a *prima facie* showing with respect to these counts as well. The fraudulent conveyance claims do not arise out of or relate to any of the supposed jurisdictional contacts listed in paragraph 23 of the amended complaint. Moreover, plaintiffs' allegations regarding the conveyances themselves, found in paragraphs 102 through 127, do not suggest that she had any contacts with New York in connection with these claims. Accordingly, Section 302, which provides for specific jurisdiction, has no application to these claims. Therefore, despite the focus on the RICO claims in the body of the opinion, all claims against Afsar are dismissed for lack of personal jurisdiction.

bush, Manou Faily, and Mr. McRory, and their fraudulent conveyance claims against him arise out of this transaction.[136]

Section 302(a), subd. 1, authorizes New York courts to exercise jurisdiction over nondomiciliaries for tort and contract claims arising from a defendant's transaction of business in the state.[137] "It is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." [138] "The phrase 'transacts business' has been interpreted 'to require a certain quality, rather than a specific quantity of contacts with New York.' " [139]

There is no real dispute that the Timberland & Tiburon Transaction took place in New York and was a substantial business transaction for Sphinx Rock and Satinwood, the companies that thereby acquired allegedly valuable limited partnership interests. Nor is it controversial to assert that plaintiffs' fraudulent conveyance claims are directly related to the transaction. The question is whether Satinwood and Sphinx Rock engaged in the transaction in New York as agents on behalf of Ahmed.

 It is well settled that a corporation may act as an agent for an individu-

al for purposes of Section 302(a), subd. 1.[140] At this stage, plaintiffs must make a *prima facie* showing that Satinwood and Sphinx Rock acted for the benefit of, with the knowledge and consent of, and under some control by, Ahmed.[141]

Mr. McRory's deposition testimony demonstrates that he and Manou Faily acted as agents of Satinwood and Sphinx Rock in carrying out the transaction. It shows also that Ahmed had knowledge of and consented to the companies' activities in this transaction.[142] The faxed letter from Faily to Ahmed on July 20, 1995 suggests at least that Ahmed had some control over the participation of Satinwood and Sphinx Rock in the transaction.[143] Finally, plaintiffs have demonstrated adequately that Satinwood and Sphinx Rock ultimately acted for the benefit of Ahmed because they produced evidence of Ahmed receiving a portion of Sphinx Rock's receipt of a loan repayment from Tiburon, Ltd. and Timberland, Ltd.[144] Thus, plaintiffs have made a *prima facie* that Ahmed is amenable to suit under the New York long-arm statute on the fraudulent conveyance claims in Counts One and Two. Due Process analysis for these counts will proceed below in another section.

 However, "it is important to remember that a plaintiff ... must secure personal jurisdiction over a defendant with respect to *each claim* [he or] she as-

---

**136.** Pl. Mem. 45.

**137.** *Kreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d at 198, 522 N.E.2d 40.

**138.** *Id.*

**139.** *Pieczenik v. Dyax Corp.,* No. 00 Civ. 243(HB), 2000 WL 959753, at *4 (S.D.N.Y. July 11, 2000), *aff'd,* 265 F.3d 1329 (Fed.Cir. 2001).

**140.** *Kreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d at 199, 522 N.E.2d 40; *see also Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 22 (2d Cir.1988) ("*Kreutter* thus resolves the is-

sue of whether a corporation can act as an agent for an individual for purposes of § 302(a)(1).").

**141.** *See Grove Press,* 649 F.2d at 122; *Kreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d at 199, 522 N.E.2d 40.

**142.** *See* Berry Decl. Ex. 22, McRory Dep. 166.

**143.** *See id.* Ex. 24.

**144.** Berry Aff. Ex. 20.

serts."[145] Section 302(a), subd. 1, requires a "substantial nexus" between the cause of action and the defendants' activities in New York.[146] As plaintiffs implicitly acknowledge in their memorandum of law,[147] this nexus is lacking between the Timberland & Tiburon Transaction and plaintiffs' RICO conspiracy claim against Ahmed.

■ The Timberland & Tiburon Transaction occurred in 1995, and the amended complaint alleges that RICO conspiracy "began on January 16, 1997."[148] While the Timberland & Tiburon Transaction is part of the pattern of racketeering activity in which Sohrab allegedly engaged between 1995 and 1999, Count Six can be read only as alleging an agreement to further a distinct unlawful endeavor, one that did not come into being until 1997 and one that revolved primarily around Sohrab's alleged inheritance.[149] Thus, plaintiffs' RICO conspiracy claim against Ahmed does not arise from or directly relate to his transaction of business in New York state in 1995 through his agents, Satinwood and Sphinx Rock, and Section 302(a), subd. 1, does not provide personal jurisdiction over him on this claim.

■ Plaintiffs attempt also to invoke Section 302(a), subd. 1, for the RICO con-spiracy claim by alleging that "Ahmed traveled to New York in early May 1997 and met with his nephew, Sohrab, in connection with the transactions involved in Sohrab's bankruptcy and the instant lawsuit."[150] This vague and conclusory allegation lacks the factual specificity necessary to contribute to plaintiffs' *prima facie* showing of jurisdiction.[151]

### b. Section 302(a), subd. 2

As with Afsar, plaintiffs seek to invoke Ahmed's status as an alleged co-conspirator to attribute Sohrab's in-state acts to Ahmed. Having underestimated what is required to demonstrate the requisite agency relationship in the co-conspirator context, plaintiffs' attempt to invoke Section 302(a), subd. 2, fails.

As noted above, "[t]he requisite relationship between the defendant and its New York co-conspirator[ ] is established by a showing that:(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirator[ ] was to the benefit of the out-of-state conspirator[ ]; and (c) the co-conspirator[ ] acting in New York acted 'at the direction or under the control' or 'at the request or on behalf of' the out-of-state defendant."[152]

**145.** 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1069.7 (2002) (emphasis added) [hereinafter WRIGHT & MILLER 3D]; *see Anglo Am. Ins. Group, P.L.C. v. CalFed Inc.*, 916 F.Supp. 1324, 1332 n. 17 (S.D.N.Y.1996).

**146.** *See Pieczenik*, 2000 WL 959753, at *4 (citing *Beacon Enter., Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir.1983), in turn citing *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321. 52 N.Y.2d 268, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981)).

**147.** *See* Pl. Mem. 44–45 (indicating that the acts of Brickellbush, Satinwood, Sphinx Rock, and Faily in connection with the Timberland & Tiburon Transaction would give

the Court long-arm jurisdiction "on the First and Second pendent state law claims").

**148.** Am. Cpt. ¶ 167.

**149.** *Id.* ¶ 173 ("At the January 16, 1997 meeting, Sohrab, Ahmed, Afsar and Schlegelmilch agreed to assist Sohrab's efforts in concealing from plaintiffs the fact that Sohrab was entitled to a significant inheritance from Soleyman and to conceal his interest in the Vahabzadeh family assets overseas.")

**150.** Am. Cpt. ¶ 22(g).

**151.** *See, e.g., Jazini*, 148 F.3d at 184, 185; *Barrett*, 646 F.Supp. at 1350.

**152.** *Simon*, 86 F.Supp.2d at 120 (quoting *Chrysler Capital Corp.*, 778 F.Supp. at 1268–

Here, plaintiffs have not satisfied the control prong. They allege · that Ahmed exercised *de facto* control over Soleyman's affairs during the latter part of his life, and that this demonstrates control because the alleged fraudulent conveyance of Sohrab's inheritance occurred as part of the disposition of Soleyman's estate.[153] Plaintiffs allege also that Ahmed had unchallenged authority within his family and called the January 16, 1997 meeting at which the conspiracy began.[154]

These allegations go to Ahmed's alleged control of Vahabzadeh family matters in general rather than to the specific tortious acts purportedly committed by Sohrab in New York.[155] Moreover, plaintiffs adduce no evidence suggesting any degree of control by Ahmed over Sohrab's specific instate acts in furtherance of the alleged conspiracy. Finally, plaintiffs have not sufficiently alleged that Sohrab acted in New York for the benefit of Ahmed. Indeed, the gist of the complaint is that Sohrab acted in New York to frustrate his own creditors for his own economic advantage. Thus, co-conspirator jurisdiction under Section 302(a), subd. 2, is not available over Ahmed on the RICO conspiracy claim.

### c. Section 302(a), subd. 3

As noted above, Section 302(a), subd. 3, confers personal jurisdiction over a nondomiciliary who commits a tort outside the state causing injury in the state when the plaintiff's claim arises out of that tortious act, and the nondomiciliary defendant either (i) regularly does or solicits business in New York, or engages in any persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in the state, or (ii) expects or reasonably should expect the tortious act to have consequences in the state and derives substantial revenue from interstate or international commerce.[156]

Plaintiffs attempt to invoke Section 302(a), subd. 3, alleging that Ahmed sent a fraudulent letter to the bankruptcy court in Manhattan on September 4, 1998. For the reasons discussed above in connection with Afsar's letter to the bankruptcy court,[157] plaintiffs have not established that this alleged tortious act caused them injury within the state. Accordingly, plaintiffs' have failed to make a *prima facie* showing that the Court may exercise personal jurisdiction over Ahmed on the RICO conspiracy claim under Section 302(a), subd. 3.

### d. Pendent Personal Jurisdiction

Plaintiffs attempt to invoke the doctrine of pendent personal jurisdiction to assert personal jurisdiction over Ahmed on the RICO conspiracy claim in Count Six, despite the Court's determination that Ahmed is not amenable to suit on this claim under New York law. They argue that the Court may exercise personal jurisdiction over Ahmed on Count Six because it has jurisdiction over him on Counts One and Two and the state and federal claims share a "common nucleus of operative fact." [158] Their argument lacks merit.

69, in turn quoting *Dixon*, 507 F.Supp. at 350); *see also Grove Press*, 649 F.2d at 122; *Kreutter*, 71 N.Y.2d at 467, 527 N.Y.S.2d at 199, 522 N.E.2d 40.

**153.** Pl. Mem. 42.

**154.** *Id.*

**155.** *See, e.g., Grove Press*, 649 F.2d at 122 (required showing is that alleged agent "*acted*

*in New York* ... under some control by ... the nonresident principal" (emphasis added)).

**156.** N.Y. C.P.L.R. § 302(a), subd. (3)(i)-(ii) (McKinney 2001).

**157.** *See supra* text accompanying notes 58–59, 133–36.

**158.** Pl. Mem. 45–46.

■ While the doctrine of pendent personal jurisdiction has received a warm welcome in this circuit,[159] it is not clear that it extends as far as plaintiffs argue.[160] But it is unnecessary to decide this question here, as plaintiffs' RICO conspiracy claim against Ahmed does not share a common nucleus of operative fact with their fraudulent conveyance claims against him.[161]

■ As noted above, the amended complaint alleges that the RICO conspiracy involving Ahmed began in January of 1997 and that the fraudulent transaction that is the subject of Counts One and Two took place on July 31, 1995.[162] The time disparity itself suggests that the same underlying facts are not at issue in both claims.[163]

Moreover, different evidence and different witnesses likely would be required to establish liability. For the fraudulent conveyance claims, the key issues would be whether Sohrab made the transfer in contemplation of bankruptcy (*i.e.*, his intent) and his financial condition before and after the transaction, as well as possibly Ahmed's knowledge of Sohrab's intent and financial position. For the RICO conspiracy claim, the key issues would be what Ahmed, Afsar, Schlegelmilch, and Sohrab agreed in January 1997 to do and whether what they agreed to do or facilitate, if completed, would have constituted a substantive RICO violation.[164] The focus of

159. *E.g., IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1056 (2d Cir.1993) (holding that, when court has personal jurisdiction over defendant on federal claim by virtue of statute authorizing nationwide service of process, it may exercise pendent personal jurisdiction over related state law claims), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Hargrave v. Oki Nursery, Inc.,* 646 F.2d 716, 719–21 (2d Cir.1980) (holding that, when court has personal jurisdiction over defendant on state law claim, it may exercise personal jurisdiction on related state law claim); *see also Robinson Eng'g Co. Pension Plan & Trust v. George* 223 F.3d 445, 449 (7th Cir.2000) (holding that, when court has jurisdiction over foreign defendant on a federal securities claim, it may exercise pendent personal jurisdiction on RICO claim sharing a common nucleus of operative fact).

160. Without going into excessive detail, it is arguable that a state law claim over which a district court has subject matter jurisdiction only by reason of pendent party jurisdiction, as codified in 28 U.S.C. § 1367(a), is an insufficient anchor for assertion of pendent personal jurisdiction over a federal claim that otherwise could not be heard in the forum state. This view is suggested by the Second Circuit's rationale in *Hargrave,* in which the court tied its exercise of personal jurisdiction to the federal court's subject matter jurisdiction to hear "actions," as provided by 28 U.S.C. § 1332. *See Hargrave,* 646 F.2d at 719–20. While, as pointed out by the *Har-*

*grave* court, Sections 1331 and 1332 of Title 28 grant the district courts original jurisdiction over "civil actions" when their requirements are met, Section 1367(a) grants district courts subject matter jurisdiction over "claims" only. *See* 28 U.S.C. § 1367(a).

161. There is no question that application of pendent personal jurisdiction requires a common nucleus of operative fact between the claim over which jurisdiction has been established and the claim over which pendent personal jurisdiction is sought. *See Robinson Eng'g,* 223 F.3d at 449; *Herrmann,* 9 F.3d at 1056; *Hargrave,* 646 F.2d at 719–20; 4A Wright & Miller 3D § 1069.7.

162. Am Cpt. ¶¶ 72, 87, 167.

163. *See, e.g., Wigand v. Flo–Tek, Inc.,* 609 F.2d 1028, 1033 (2d Cir.1979) (applying *Gibbs* test in subject-matter jurisdiction context and reversing the district court's exercise of jurisdiction when the federal claim rested on events prior to the effective date of a contract while state law claim rested on events occurring after that date).

164. *See Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.").

the RICO conspiracy claim thus would be on the co-conspirators' conduct on January 16, 1997 and thereafter, not on events that transpired approximately a year-and-half before the conspiracy even came into existence.

■ In sum, plaintiffs' claims against Ahmed in Counts One and Two do not share a common nucleus of operative facts with their claims against him in Count Six.[165] Pendent personal jurisdiction over him on Count Six is not permissible, even assuming *arguendo* that pendent personal jurisdiction may be asserted over a federal claim based on a state claim.

As plaintiffs have established no grounds upon which to exercise personal jurisdiction over Ahmed on the RICO conspiracy count, their claims against him in Count Six are dismissed.

*3. Afiwa*

■ Plaintiffs contend that Afiwa is subject to the personal jurisdiction of this court for two reasons: they allege that Afiwa (1) is Ahmed's *alter ego* and thus his jurisdictional contacts are attributable to Afiwa under the principles of agency [166] and (2) sent a fraudulent letter to the bankruptcy court in Manhattan.[167] These allegations, along with plaintiffs' evidentia-

ry submissions, are insufficient to make out a *prima facie* showing of personal jurisdiction over Afiwa.

First, plaintiffs make no specific arguments regarding Afiwa in their opposition papers and cite no authority for their sweeping view of jurisdiction based on the alleged agency relationship between Ahmed and Afiwa. They certainly have not alleged either that Afiwa acted on behalf of Ahmed or that Ahmed acted on behalf of Afiwa in connection with the Timberland & Tiburon Transaction upon which Counts One and Two are based.

Plaintiffs' second allegation invokes Section 302(a), subd. 3. However, as noted above, plaintiffs have failed to make a *prima facie* showing that the letters sent to the bankruptcy court caused them injury within the state,[168] and thus Section 302(a), subd. 3, is unavailable as well.

Accordingly, plaintiffs have failed to make a *prima facie* showing of personal jurisdiction over Afiwa under New York law, and the claims against it are dismissed.

*E. Due Process*

Because the Court has determined that Ahmed is amenable to service of process under New York law on the fraudulent

---

**165.** The Court has subject-matter jurisdiction over plaintiffs' claims against Ahmed in Counts One and Two, even though they do not share a common nucleus of operative facts with the federal claim against him in Count Six, pursuant to 28 U.S.C. § 1367(a), which incorporates what formerly was known as "pendent party jurisdiction." "Pendent party jurisdiction, as compared to pendent [subject matter] jurisdiction, involves the assertion of 'jurisdiction over *parties* not named in any claim that is independently cognizable by the federal court.'" *Colonomos v. Ritz–Carlton Hotel Co., LLC,* No. 98 Civ. 2633(RCC), 2002 WL 732113, at *4 n. 8 (S.D.N.Y. Apr. 25, 2002) (emphasis in *Colonomos* opinion) (*quoting Finley v. United States,* 490 U.S. 545, 549, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989)).

Here, plaintiffs' fraudulent conveyance claims against Ahmed arise out of a common nucleus of operative fact with their substantive RICO claim against Sohrab in Count Five of the amended complaint and thus are subject to the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a).

**166.** Plaintiffs' first allegation is pertinent only to Counts One and Two because the Court has determined that Ahmed is only subject to the Court's personal jurisdiction on those two counts.

**167.** Am. Cpt. ¶ 26.

**168.** *See supra* text accompanying notes 133–35.

conveyance claims in Counts One and Two, it now must determine whether assertion of personal jurisdiction in the circumstances comports with the requirements of due process.[169]

The due process test for personal jurisdiction has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry.[170] The Court first must determine whether the defendant has sufficient contacts with the forum state to justify the exercise of personal jurisdiction. Then, if minimum contacts are found, the Court undertakes the "reasonableness" inquiry and considers whether "the assertion of personal jurisdiction . . . is reasonable under the circumstances of the particular case." [171]

*1. Minimum Contacts*

For purposes of the minimum contacts inquiry, "a distinction is made between 'specific' jurisdiction and 'general' jurisdiction." [172] "Specific jurisdiction exists when 'a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum'; a court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." [173] The minimum contacts

test for specific jurisdiction is less stringent than that for general jurisdiction.[174] Here, plaintiffs' fraudulent conveyance claims arise directly out of Ahmed's transaction of business in New York through corporate agents. The more lenient specific jurisdiction standard therefore applies.

To establish the minimum contacts necessary to justify specific jurisdiction, the plaintiff must show that the defendant "purposefully availed" himself of the privilege of doing business in New York and that the defendant could foresee being "haled into court" in the state.[175]

Here, plaintiffs have made a *prima facie* showing that Ahmed deliberately engaged in a significant business transaction in New York when he caused Sphinx Rock and Satinwood to purchase certain limited partnership interests from Peninsula/Sohrab. Not only did the alleged transaction occur within the state, but Ahmed allegedly contracted with Sohrab, a resident of New York, and made use of the services of Mr. McRory, a New York attorney, to carry out the transaction. In light of plaintiffs' *prima facie* showing regarding the agency relationship between Ahmed and Satinwood and Sphinx Rock, the Timberland & Tiburon Transaction was certainly "action [by Ahmed] purposefully directed toward the forum state" [176]

169. See *Kernan*, 175 F.3d at 240.

170. *Metro. Life Ins.*, 84 F.3d at 567.

171. *Id.* at 568.

172. *Id.* at 567.

173. *Id.* at 568 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 & nn. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

174. *See id.*

175. *Kernan*, 175 F.3d at 242–43 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

176. *Id.* at 243 (internal quotation marks and emphasis omitted) (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion)). Thus, even under the *Asahi* plurality's more restrictive view of minimum contacts, Ahmed's contacts would suffice.

and Ahmed, via Sphinx Rock and Satinwood, certainly could foresee being sued in New York in connection with this transaction. Thus, the minimum contacts test is satisfied, and the Court will proceed to consider the reasonableness of exercising personal jurisdiction here.

### 2. Reasonableness

There are five reasonableness factors relevant to the inquiry here:

"(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."[177]

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"[178] While defendants fail to make any arguments at all in their motion papers regarding due process, the Court nevertheless will consider the above factors.

Because Ahmed is a citizen and resident of Switzerland, the burden imposed on him would be significant, thus cutting against a finding of reasonableness.[179] This burden is not dispositive, however, because "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."[180] This is such a case. New York has a strong interest here in enforcing its debtor-creditor law, as the fraudulent conveyances at issue allegedly were made to frustrate New York judgments. The plaintiffs also have strong interests in litigating in this forum, as the fraudulent conveyance claims are related to their RICO claims against Sohrab and many of the key events surrounding that claim allegedly transpired in New York. The final two factors do not cut strongly one way or the other.

On balance, and taking into consideration the presumption in favor of an exercise of jurisdiction once minimum contacts have been established, the Court finds that exercising personal jurisdiction over Ahmed on Counts One and Two is reasonable for purposes of the Due Process Clause. Accordingly, defendants' motion to dismiss Counts One and Two against Ahmed on jurisdictional grounds is denied.

### III. Remaining Ground for Dismissal

The moving defendants seek also dismissal of all claims against them for failure to state a claim pursuant to Rule 12(b)(6) and for failure to comply with Rule 9(b). The entirety of their Rules 12(b)(6) and Rule 9(b) arguments revolve around plaintiffs' RICO claims. As all of the RICO claims against the moving defendants have been dismissed, this part of the motion is moot.

---

**177.** *Id.* at 244 (internal quotation marks omitted).

**178.** *Metro. Life Ins.,* 84 F.3d at 568 (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

**179.** *Asahi,* 480 U.S. at 114, 107 S.Ct. 1026 ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

**180.** *Id.*

**404**

### IV. Conclusion

For the foregoing reasons, the moving defendants' motion is disposed of as follows:

1. It is granted to the extent that the amended complaint is dismissed with respect to Afsar for lack of standing and lack of personal jurisdiction.

2. It is granted to the extent that the amended complaint is dismissed with respect to Afiwa for lack of personal jurisdiction.

3. It is granted to the extent that plaintiffs' RICO conspiracy claim against Ahmed is dismissed for lack of personal jurisdiction.

4. It is denied in all other respects.

SO ORDERED.